Bobby Clinton **THOMPSON**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–75–402.

Court of Criminal Appeals of Oklahoma.

Oct. 22, 1975.

Benjamin J. Curtis, Poteau, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Bobby Clinton Thompson, hereinafter referred to as defendant, was charged initially for the offense of Murder in the District Court, LeFlore County, Case No. CRF–73–3, in violation of 21 O.S.1971, § 701. Thereafter the charge was amended to Manslaughter in the Second Degree, in violation of 21 O.S.1971, § 716, and defendant was subsequently tried and convicted of said offense. His punishment was fixed at a term of four (4) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness at trial was Joe Shadwick who testified that he lived in Wister, Oklahoma, and had lived there for most of his life. Upon being shown State's Exhibit No. 1, a shotgun, he testified he received said shotgun from the defendant. He stated that after receiving the shotgun from the defendant he gave it to one D. V. Cockburn. When recalled as a witness, he testified he operated Fisherman's Corner at Wister, and that on the 6th day of January, 1973, he saw the defendant at approximately 5:00 or 6:00 p.m. when the defendant bought two six-packs of beer and some tomato juice, at which time the defendant drank three cans of beer in the presence of the witness. After about one and a half hours the defendant left, but he later saw the defendant at approximately 8:00 or 8:30 p.m. at the store when the defendant related to him that he

thought he had killed a man. The witness stated that he then took the defendant to the defendant's parents in Cameron, Oklahoma. He stated that when they got into the car to go to the defendant's parents' home the defendant had State's Exhibit No. 1 and was ejecting the shells from it and that the defendant then gave the gun to the witness because the defendant owed him some money. The witness testified that the defendant appeared to be excited and upon his return to the store he gave State's Exhibit No. 1 to D. V. Cockburn, who was there.

D. V. Cockburn testified he lived in Wister and that on the 6th day of January, 1973, he saw Joe Shadwick from whom he received a shotgun, which he identified as being State's Exhibit No. 1. After receiving the shotgun from Mr. Shadwick he gave it to Deputy Sheriff Edd Schiffner.

Edd Schiffner testified that in January, 1973, he was Deputy Sheriff for LeFlore County and upon being shown State's Exhibit No. 1 he identified said shotgun as the gun he had received from D. V. Cockburn in Wister on January 6, 1973.

Sam Sparks testified he was an agent with the Oklahoma State Bureau of Investigation and he identified State's Exhibit No. 1 as the shotgun which he had had in his possession at one time but returned to the Sheriff's Office the same day he had received it.

Mildred Kiefer testified that on January 6, 1973, she was married to Loaton Kiefer, the decedent, and that they had a family consisting of one daughter and one son. She stated the defendant was married to her daughter Sherry, and that they had a son named Bobby, Jr. On the 6th day of January, 1973, she and her husband traveled to Poteau to buy some medicine and on their return they stopped at their daughter's house in Wister State Park at approximately 4:00 or 5:00 p.m. Her daughter and grandson accompanied them home, arriving at approximately 5:30. She stated that at approximately 7:00 p.m. the defendant drove up to their house and

honked. Sherry and Bobby, Jr. went out to the car, but Bobby, Jr. came back into the house crying. Then, the decedent went out to the car and the witness followed. She observed her daughter, Sherry, and the decedent standing beside the "Scout" truck in which the defendant was sitting. She stated that she observed the defendant load a gun, jump out of the truck and point the gun at the decedent. The decedent then attempted to push the gun away when the decedent leaned over and the defendant struck the decedent on the head causing the decedent to fall to the ground. She said that no words were said prior to the defendant's striking the decedent and that she thereafter ran to a nearby wood pile carrying Bobby, Jr. She then observed the defendant waving the gun and heard him say he was going to kill them all if Sherry did not go back with him. The defendant fired the gun in the air and then began beating the decedent on his chest. She testified that she and Sherry begged the defendant to quit. She testified that she requested the defendant to get help and that the defendant left returning shortly saying that he could not find anyone. Shortly thereafter, the defendant left again. She and her daughter went to the witness' father's house which was approximately one and one-half miles from her own house, and from there the authorities were notified. Upon being shown State's Exhibit No. 1, she identified it as the shotgun resembling the gun with which the defendant had hit the decedent on January 6, 1973.

Dr. Kent Smith testified he was a pathologist residing in Ft. Smith, Arkansas, and that on occasions he assisted the State Medical Examiner in Oklahoma by performing certain autopsies. He stated that on the 7th of January, 1973, he examined the body of the decedent at Sparks Hospital in Ft. Smith, and the examination revealed lacerations of the head with an underlying skull fracture and resultant hemorrhaging. He determined the cause of death was a fracture of the skull. Upon

being shown State's Exhibit No. 1, he testified that the laceration of the decedent's head could have been caused by such an object. On cross-examination he testified that for a person to fall and hit a rock sustaining a laceration such as the decedent's, that person would have to fall quite hard.

Claudie Higgins testified that in January, 1973, he was a Deputy Sheriff of LeFlore County. On January 6, 1973, he took the defendant into custody at the defendant's father's house in Cameron, Oklahoma, at approximately 9:45 p.m. He then transported the defendant to the Sheriff's Office in Poteau, Oklahoma.

Gene Thomas testified that he was employed as a police officer with the City of Poteau and also was a photographer. On the 6th of January, 1973, he took various photographs marked as State's Exhibits No. 2 and No. 3. He testified that said photographs truly and correctly represented said scene on January 6.

Troy Baker testified that on January 6, 1973, he was Undersheriff of LeFlore County and had occasion to be at the decedent's residence where he observed a body in the front yard who he was told was Loaton Kiefer, the decedent. The weather was cold and snowing and examination of the body revealed no pulse. He stated that the area was lighted by illumination from a house window and an outside light.

The State then rested.

The defense moved for a reading of the testimony of Dr. R. G. Gillson who had testified at a prior trial. Over the State's objection, the testimony of Dr. Gillson was read in open court and admitted into evidence. Following is a summary of said testimony. Dr. Gillson was an Osteopathic physician and surgeon in Poteau, and on the 6th of January he went to the decedent's residence in Wister in response to a call. He found the decedent in the yard covered with a blanket and an examination revealed an injury to the head. The body was taken to a hospital to complete the examination. That examination revealed lacerations to the back of the head and a sub-

sequent x-ray revealed a skull fracture. Thereafter, the body of the decedent was sent to Ft. Smith. In Dr. Gillson's opinion the cause of death was trauma which caused shock due to loss of blood as a result of hemorrhaging into the covering of the brain. He did not notice any yard lights but only illumination from car headlights. Upon being shown State's Exhibit No. 1, he testified that in his opinion the gun could not have caused the wound on decedent's head. He further stated that the wound could have been caused by falling and striking his head on a rock. On cross-examination he said he could not definitely say the gun did, or did not, cause the injury.

Orpha Hill testified to being a merchant living in Cameron and to have known and done business with the defendant all of his life. The witness testified that the defendant was known to be very honest.

Reverend Charles Phillips testified that he lived in Cameron and had known the defendant since 1958. He testified the defendant's general reputation in the community was good.

Julia McClain next testified that she lived in Cameron and had known the defendant since 1959, and that the defendant's general reputation in the community was good.

Edna Lomon testified that she lived in Cameron and had known the defendant most of his life. She further testified the defendant had a good reputation in the community.

Sherry Thompson testified she lived in Oklahoma City and was married to the defendant and that they had two children. She said that she fought with the defendant at times, and had gone to her parents on occasion after said fights. She testified that on January 6, she traveled with her parents and her son to her parents' home. The defendant arrived later and honked and she stated that he had done this on prior occasions. She went outside and observed the defendant inside the truck. Her

son came out but then returned to the house. After this she observed her parents come out, her father walking in a swift manner. He asked the defendant what was the matter, to which the defendant did not respond. She stated the defendant thought her father was going to jump into the truck and that thereafter the defendant hit him and he fell. She stated the defendant tried to revive him by hitting him on the chest. The defendant then tried to get help, but returned unsuccessful and again tried to revive her father. The defendant then left again and did not return. Thereafter, she and her mother went to get help. At the time this incident occurred the defendant was disabled having incurred an injury while working on an oil rig, and was nervous taking "nerve pills and blood pressure pills." She further stated that her father always carried a pocket knife and she thereafter recalled an incident when one Mr. Lomon stabbed the defendant resulting in the defendant needing 100 stitches. Thus, she said the defendant was very afraid of knives. On the night the incident occurred the lighting outside the house was not good, according to the witness' testimony, and it was snowing. She stated that the defendant did not load the gun as it was always loaded because he hunted frequently. She admitted having made inconsistent statements regarding this matter, because at the time of making such statements she was angry with the defendant. She stated that she had previously lied about the defendant on that evening, making a statement that "he was going to kill someone."

The defendant took the stand and testified in his own behalf. He stated that he lived in Oklahoma City and that he was born and raised in Cameron. At the time the incident in question occurred, he was taking pills for "nerves and blood pressure" because of an injury incurred while working on an oil rig. He related that various family quarrels had occurred and further related an incident during which one Mr. Lomon had stabbed him. Thus, he

became very fearful of knives. He testified that on January 6, he had been at Joe Shadwick's store and had bought some beer and tomato juice, drinking three beers while talking to Joe Shadwick. Thereafter he left, went home and upon discovering his family gone he went to his wife's parents' house because that was the place they would normally be if they were not home. Upon arrival there, the decedent came out of the house and said, "what do you need big boy," and before he could answer the decedent lunged at him as if he were going to choke or "cut" him. He stated that he then hit the decedent after which the decedent fell to the ground. He then tried to revive the decedent because he could not detect a heart beat. The defendant related that he had had first aid training in the service. Thereafter, he stated, he went for help and being unable to find help, came back and then left again because he thought the decedent was dead. He stated he went to Joe Shadwick's and asked Shadwick to take him to his parents' home. He related the incident to Shadwick and later the police came to his parents' house and arrested him. The defendant made the statement that he knew the decedent carried a knife at all times, and that the lighting outside the decedent's house that night was not good and it was snowing very hard.

On cross-examination the defendant stated that he never said that he was going to kill anyone and that he was not at anytime on that night loading the gun. He further stated that Mildred Kiefer was coming toward them when the decedent fell and was not standing directly behind the decedent.

In rebuttal for the State Troy Baker testified that Sherry Thompson on the evening of January 6, at about 9:00 p.m., made a statement to him that the defendant had loaded the gun in her presence and she also told him that the defendant had asked her to accompany him home because if she did not go with him someone was going to get killed. The witness further stated that Sherry Thompson told him that

the defendant hit her father with the butt of the gun and that the defendant was outside the truck when he struck the decedent.

Also in rebuttal for the State, Woodrow Martin testified that he was the brother-in-law of the decedent by marriage and that on the 6th of January he saw the decedent lying in the yard. He stated an examination of the area where the decedent was lying revealed no rocks or objects which could have fractured the decedent's skull. Later, he dug in the area in an effort to clear the blood from the snow, but still could find no rock.

In rebuttal for the defense, the defendant testified that in the area where the decedent fell there was a rock pile and that he understood that some digging had occurred in that area.

On further rebuttal for the defense, Sherry Thompson testified that the area outside her parents' home was rocky and after the incident some digging occurred.

■ The defendant's first assignment of error asserts the trial court erred in admitting into evidence State's Exhibits Nos. 2 and 3, photographs, which were designed primarily to arouse the passion of the jury.

In *Abel v. State,* Okl.Cr., 507 P.2d 569 (1973), this Court noted:

"The second proposition contends that the court erred in admitting the photographs of the deceased into evidence. The defendant argues that the photographs were inflammatory and prejudicial and that no proper foundation was laid for their admission into evidence. We are of the opinion that the photographs were properly admitted. In *Pate v. State,* Okl.Cr., 361 P.2d 1086, we stated in the eighth and ninth paragraphs of the Syllabus:

" 'When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

" 'Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arrouse (sic) the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant.'

"The photographs in question were identified by several witnesses as being true and correct pictorial representations of the body of Jacqueline Abel as they observed her at the hospital. The pictures were not taken after extensive autopsy surgery and were not gruesome. The photographs clearly depict the various bruises upon the child's body and their probative value is not outweighed by the danger of prejudice to the defendant." (at 572)

The photographs represent the location of the decedent's injury and the area on which the decedent fell. The photographs are not gruesome and the exhibits were appropriate aids to the jury. After carefully considering State's Exhibits which were admitted into evidence over defense objections, we feel the probative value of said exhibits is not outweighed by the danger of prejudice to the defendant. For this reason we find the defendant's first assignment of error to be without merit.

Defendant's second assignment of error alleges misconduct of the prosecuting attorney prevented the defendant from having a fair and impartial trial. The defendant alleges the misconduct occurred during the prosecutor's cross-examination of the witness Sherry Thompson and during the cross-examination of the defendant. The defendant complains that during such cross-examination the prosecuting attorney was argumentative and that he made certain prejudicial statements.

■ The first instance of which the defendant now complains occurred when the prosecuting attorney propounded various questions intended to prove that witness

Thompson had made contradictory statements without the prosecution offering any proof of the same. (Tr. 161) We find that the record reflects the defendant failed to timely object and therefore the defendant has not preserved this question for appellate review. See, *McDonald v. State,* Okl.Cr., 489 P.2d 776 (1971).

The defendant next complains of a series of propounded questions occurring on pages 162, 163, 164, 165, 166, 171 and 172 of the transcript of trial proceedings reflected in the record as follows:

"Q. Well, did you talk with one of the Sheriffs, Undersheriffs that was there, surely you can remember that?

"A. Someone came out, but I don't know who it was.

"Q. Well, did you talk with him, just yes or no?

"A. Someone, yes.

"Q. Alright, and you told him about what occurred that night, didn't you?

"A. Uh huh.

"Q. Now everything was fresh in your mind at that point wasn't it when you talked to the officer just some two (2) hours after this occurred?

"A. Yes.

"Q. Isn't that correct?

"A. Yes.

"Q. You didn't have any reason to tell the officer anything but the truth at that point, would you?

"A. I was mad at Bobby and I wouldn't care if I—

"Q. Well why were you mad at this defendant, explain that to the jury? You just got through telling them you weren't mad, why, what happened that caused you to get so mad?

"A. I was already mad at Bobby.

"Q. Oh, you were mad at him, and you're just—now your're telling the jury that you deliberately lied to the Officer about how your father was killed.

"MR. CURTIS: Your Honor, I object he's insinuating that the client's lying.

"MR. WARREN: But she just said that —

"MR. WARREN: I object to that—

"THE COURT: Overruled. Allow you an exception.

"MR. WARREN:

"Q. Is that what you're telling me that because you were mad at him you just deliberately told the officers something else?

"A. I wouldn't have cared what I told him because I was mad at Bobby and I didn't care what I happened.

"Q. Alright, so are you telling the jury that you lied to the officers about what happened?

"A. Yes.

"Q. That's all I want, you lied?

"MR. CURTIS: Your Honor, I object again, it's never been testified as to what the officer said, the officer that he had here did not make any statement to that effect. I make a motion that this entire conversation be stricken from the record.

"THE COURT: Overruled Mr. Curtis.

"MR. WARREN: I don't blame him for complaining Your Honor.

"MR. CURTIS: If the District Attorney would like to testify let him take the stand.

"THE COURT: Alright gentlemen, settle down now. Overrule your objection, you will be allowed an exception.

"MR. WARREN:

"Q. Some—some week later when you —I take it you weren't mad at that time and you were in the, you talked to the secretary in the District Attorney's office, didn't you?

"A. Somone.

"Q. Your grandfather was present, your brother was present and the secretary was present?

"A. My brother wasn't there.

"Q. Your brother wasn't there? And did you at that time make the statement that the defendant grabbed the gun and started putting shells in it?

"A. No, I didn't.

"Q. You did not?

"A. No.

"Q. You weren't mad at that time, were you?

"A. Well, I was mad at Bobby.

"Q. You were mad at Bobby, you weren't scared?

"A. Yes, I was scared.

"Q. Well now if you made the statement at that time that the defendant started loading the gun, are you telling this jury that that would have been wrong and you were lying at that time?

"A. Pardon?

"Q. If you made that statement, are you telling the jury—

"A. Yes.

"Q. —that you would have been lying?

"A. Yes.

"Q. Now why would you have any purpose to—some week after this happened, still very fresh in your mind, to come into the District Attorney's offices and make that statement?

"A. My grandfather was the one that brought me up here.

"Q. Your who?

"A. My grandfather.

"Q. Now, and so—were you—did you just deliberately lie because your grandfather brought you up to the District Attorney's office?

"A. No.

"MR. CURTIS: Your Honor, he keeps stating that she deliberately lied. It has not been established—

"MR. WARREN: She admitted she lied Judge.

"MR. CURTIS: She has not. I'm going to object to this entire conversation, and he's badgering the witness. He keeps repeating that she deliberately lied, there's no evidence to that effect at all.

"THE COURT: Overruled, Mr. Curtis. Allow you an exception.

"MR. WARREN:

"Q. Would you explain to the jury why you would have made that statement at that time, was it because your grandfather was there, is that your reason?

"A. No.

"Q. Well explain—

"A. —my grandfather didn't want me to go back to him.

"Q. Well why would you make that statement at that time?

"A. I just did because I was mad at Bobby.

"Q. You were—but you were lying at that time also, is that correct?

"A. Yes.

\* \* \* \* \* \*

"Q. Now if you made the statement to the officers that the defendant jumped out and put this gun and stuck this gun right in your dad's chest or right in his face and then your dad sort of ducked down and he came down and hit your dad over the head with it, would that be a true statement?

"A. No, he fell on his back.

"Q. And if you'd made that statement, then you were just deliberately, I mean, this is the same time that you were talking, that I'm talking to you about now, when you talked to Troy Baker some two (2) hours after this incident occurred?

"A. Yes.

"Q. And this would just again be a deliberate lie?

"A. Yes.

"MR. CURTIS: Your Honor, may we approach the bench?

(Off-the record conference among counsel and the Court.)

"THE COURT: Did you hear that Mrs. —

"REPORTER: No, I didn't.

"THE COURT: Alright, make your record Mr. Curtis.

"MR. CURTIS: I would move for a mistrial at this time and the fact that the District Attorney has badgered the witness, he's testified for the witness and he's alluded on numerous occasions that she's lying and that she previously lied and talked to Troy Baker about something that he's—never been put in evidence. Therefore, I move this entire cross-examination be stricken from the record and that a mistrial be declared.

"THE COURT: Overruled. Allow you an exception."

The tone of this cross-examination reflected on said pages comes dangerously close to that condemned in *Williams v. State,* 35 Okl.Cr. 171, 249 P. 433 (1926). However, in the instant case the witness repeatedly admitted making the prior inconsistent statements by responding in the affirmative that she deliberately lied. The witness explained the prior inconsistent statements by stating she made such statements because she was at that time mad at the defendant. The prosecuting attorney subsequently introduced, in rebuttal testimony, evidence supportive of the fact that such prior inconsistent statements were made.

 We do feel that the truth or falsity of witness Thompson's testimony or of her prior inconsistent statements is a factual determination to be made by the trier of fact, the jury. Yet, we cannot say that the questions propounded by the prosecuting attorney were made in bad faith, made to impart a personal opinion, or made intentionally to prejudice the defendant. This Court in the first paragraph of the Syllabus to *Valenti v. State,* Okl.Cr., 392 P.2d 59 (1964), referred to the general rule of law as follows:

"Where it is contended that the trial court erred in permitting the county attorney to ask defendant incompetent and prejudicial questions on cross-examination, it must appear from the record that the questions were asked for the evident purpose of taking an unfair advantage of defendant, by containing therein matter which the examiner knew to be untrue, or else incapable of proof."

Certainly this rule of law would be equally applicable to defense witnesses. Also, in the first paragraph of the Syllabus to *Henry v. State,* 6 Okl.Cr. 430, 119 P. 278, as quoted in *Williams v. State,* 92 Okl.Cr. 70, 220 P.2d 836 (1950), this Court stated:

" 'On cross-examination a witness may be asked any question the answer to which would tend to test his means of knowledge, his intelligence, the reliability of his memory, or his bias, prejudice, or interest in the case.' "

And the Court went on to say:

" '. . . Necessarily the object of cross-examination is to break or weaken the force of the testimony given by the witness on his examination. From this it follows that any matter which would have a tendency to lessen the credibility of a witness is a proper matter if inquiry on cross-examination. The general rule, therefore, is that anything which tends to show bias or prejudice on the part of the witness or anything which shows his friendship or enmity toward either of the parties is commonly a proper subject of inquiry; so, also, is anything which tends to show that in the circumstances in which he is placed he has a strong temptation to swear falsely. . . .' "

Thus under the facts and circumstances in this case, and after examining the entire record we do not feel the conduct of the prosecuting attorney prejudiced the defendant in any manner. Certainly the credibility of witness Thompson was an issue and certainly the prosecutor's cross-examination of witness Thompson was a search for the truth and not an attempt to prejudice the defendant.

■ Also, under this assignment of error the defendant argues he was prejudiced when the prosecuting attorney read into evidence prior testimony of witness Thompson in an attempt to show another prior inconsistent statement. (Tr. 183) We note that the question propounded to the witness was asked and answered prior to the objection of the defendant. First we do not feel that the defendant's objection to the District Attorney's question was timely and further the defendant failed to make a motion to strike preserving his record. See, *Relf v. State*, 44 Okl.Cr. 239, 280 P. 851 (1929). However, in examining the question propounded and the answer given by the witness, we do not feel the defendant was prejudiced especially by the fact that the prosecuting attorney did not pursue the matter further after a subsequent conference at the bench. For the reasons herein stated, we find the defendant's second assignment of error to be without merit.

■ Defendant's third assignment of error asserts the trial court erred in allowing testimony from a witness who had remained in the courtroom after the rule had been invoked. We first note that the testimony of which the defendant now complains is that of Woodrow Martin who was called as a rebuttal witness for the State.

We need only note this Court's language in *Sutterfield v. State*, Okl.Cr., 489 P.2d 1345 (1971), wherein is stated:

"[W]e need only observe that when the court orders witnesses to be sworn and excluded from the courtroom during the taking of testimony, and a witness violates such rule, it is within the discretion of the court to allow or exclude the testimony of such witness. We further observe that the other witnesses complained of as being in the courtroom, were all rebuttal witnesses, and, therefore, not within the rule."

The testimony of Woodrow Martin does not fall within the rule and for this reason we find the defendant's third assignment of error to be without merit.

Defendant's fourth assignment of error asserts the trial court erred in the giving of Instruction number 16, covering the flight of the defendant. The evidence revealed that the defendant did leave the scene of the incident in question and was later found at his parents' home. Instruction number 16 reads is as follows:

"You are instructed that evidence has been offered tending to show flight by the defendant shortly after the commission of the crime alleged against him in the information. If you find from the evidence that the defendant did at some time flee from the scene of the commission of the crime alleged against him, and that such flight was induced by his apprehension of being charged with a public offense by reason thereof, to-wit: of Manslaughter in the second degree, this is a circumstance to be considered by you, in connection with all the other evidence, to aid you in determining the question of the guilt or innocence of the defendant."

The State urges that the question of flight was properly submitted to the jury to determine whether the action of the defendant was for the purpose of evading apprehension and being charged with a crime, inasmuch as the question of flight is one of fact and not of law. The State submits the issue was for the jury's determination pursuant to a proper instruction. The State further urges the trial court properly submitted the question to the jury with an instruction identical to the instruction approved in *Ward v. State*, Okl.Cr., 444 P.2d 255 (1968); *Denney v. State*, Okl.Cr., 346 P.2d 359 (1959) and *McFay v. State*, Okl.Cr., 508 P.2d 273 (1973).

The defendant's reply brief asserts there is no evidence that defendant went to any place but his home and that had defendant wanted to escape justice he would at least have tried to leave the county.

A similar assertion was made by defendant in *Padillow v. State,* Okl.Cr., 501 P.2d 837 (1972), wherein the defendant asserted that because he remained in the vicinity after the tragedy occurred that fact should be sufficient to negate the instruction on flight. Rejecting this assertion, this Court held that was one of the facts before the jury, along with the other testimony concerning defendant's actions in the house, all of which the jury is presumed to have considered when arriving at a verdict. We feel that in light of the evidence presented the issue of flight was properly submitted to the jury and for this reason we find the defendant's fourth assignment of error to be without merit.

The defendant's fifth assignment of error asserts the trial court erred in not granting a new trial on newly discovered evidence. The defendant argues the newly discovered evidence was a certain photograph of the area where the decedent was found showing the condition of said area and, thus, the photographs were material to show the probable cause of death. The defendant further contends that if the photographs had been available at trial the jury's verdict would have been different.

In the hearing on the motion for new trial the evidence showed that said photographs were in existence at the time of trial and that they were in the file of one Elton Thompson, the defendant's attorney at his first trial. The defendant simply urges he was not aware of the photographs until the trial was over.

This Court, in *Mitts v. State,* Okl.Cr., 345 P.2d 913 (1959), in the eighth paragraph of the Syllabus stated:

"Where evidence is urged by defendant on a motion for new trial on the ground the same is newly discovered, it must be established that the same, if existing at the time of trial, could not have been procured before trial by the exercise of due diligence, and failure to do so constitutes a bar to a new trial on such ground. 22 O.S.1951 § 952."

It was the duty of the trial court to weigh all of the evidence presented at the motion for new trial and the granting of a new trial on the ground of newly discovered evidence is a matter largely within the discretion of the trial court, and is not to be exercised except where there is the probability that, if such evidence had been introduced, different results would have been reached. See, *Walters v. State,* Okl. Cr., 403 P.2d 267 (1965).

We agree with the State that the defendant failed to show that the exercise of reasonable diligence would not have revealed said photographs. For the reasons herein stated, we find the trial court properly exercised its discretion in overruling defendant's motion for a new trial and, thus, we find defendant's fifth assignment of error to be without merit.

The defendant's final assignment of error asserts that the verdict of the jury is contrary to the law and evidence. The evidence presented at trial establishes that the decedent came out to the truck in which the defendant was sitting. Thereafter, the evidence is in conflict as to whether the defendant got out of the truck, pointed the gun at the decedent, and thereafter struck the decedent on the head with the gun, or whether the decedent approached the truck and lunged at the defendant at which time the defendant struck the decedent in the head. We need only note that there was sufficient competent evidence in the record from which the jury could reasonably conclude the defendant was guilty as charged. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See, *Jones v. State,* Okl.Cr., 468 P.2d 805

(1970). For this reason this Court has no authority to invade the province of the trier of facts and make a determination of the defendant's guilt or innocence, and therefore we find the defendant's final assignment of error to be without merit.

In conclusion we observe the record is free of any error which would justify modification or reversal and the judgment and sentence appealed from is, accordingly, *affirmed*.

BRETT, P. J., and BUSSEY, J., concur.