**Carneil Lamar DAVIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–353.**

Court of Criminal Appeals of Oklahoma.

Jan. 4, 1977.

W. Lawrence Eakin, Jr., Milor, Eakin & Burns, Ardmore, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Kenneth Lisle, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge.

The Appellant, Carneil Lamar Davis, hereinafter referred to as defendant, and a Garonski Goodlow, were jointly charged, tried and convicted for the crime of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2, in the District Court, Carter County, Case No. CRF–75–131. In accordance with the verdict of the jury, a sentence of ten (10) hears to life imprisonment was imposed on each defendant. From this judgment and sentence defendant Davis has perfected a timely appeal.

The State's first witness was Emery J. Stephenson who testified that on the night of July 27, 1975, and the early morning hours of July 28, 1975, he was a customer at Lue's Supper Club in the City of Ardmore, Oklahoma. The witness testified that he arrived at the supper club around 10:00 p. m. He then identified the defendant as being present at the club that night. The witness stated that he first saw the defendant, along with co-defendant Goodlow, in the parking lot outside the supper club sitting on the trunk of an automobile. The witness further testified that he had seen the deceased, Ronald Jake Smith, at that same supper club around midnight. He then observed the deceased go outside, at which time the witness followed him. He observed a conversation between the deceased and a Johnny Pickens, which occurred in the parking lot outside the club. The witness stated that the parties then went back inside for a few minutes and that the deceased again left the club. As the witness was leaving the parking lot he heard a shot. He testified that he saw the defendant and the co-defendant run from the parking lot and then observed the deceased lying on the ground. The witness then identified a picture of the deceased lying on the ground. He testified that he then called an ambulance and subsequently gave the police a partial description of the appearance and clothing worn by the two persons he had seen running from the parking lot.

The cross-examination of the witness concerned inconsistencies as to dates and times he had previously given at the preliminary hearing. The witness also, on cross-examination, testified about the amount of beer and wine he drank on the night in question, and pointed out that he did not see a gun, or a flash from a firearm of any kind.

The State's second witness was Johnny Pickens, who testified that he was the operator of Lue's Supper Club during the late evening hours of July 27th and the early morning hours of July 28th, 1975. He testified that about 3:00 a. m. he observed the prior witness, Emery J. Stephenson, finish a beer and go outside. At that time he heard someone calling his name [the witness'] and started toward the door of the tavern. The witness then offered testimony as to a conversation he had with the deceased in the parking lot outside the bar. Defense counsel objected and a hearing was held, outside

the hearing of the jury, to determine the admissibility of the evidence. The trial court ruled that the evidence of the conversation had between the deceased and the witness was admissible as part of the res gestae. The witness then testified as to what the deceased told him, as follows:

"MR. ROBERTS [Assistant District Attorney]:

"Q. You heard your response. When you got out the door, will you continue and tell what Mr. Smith told you when you got outside the door.

"A. He told me that two guys, two young guys try [sic] to rob him and he said they was sitting on the hood of that car and I said, 'what guys', and he said, 'oh, two young punks', that's what he said, said, 'they tried to rob me', said, 'one pulled knife around my throat and the other one put a gun at my heat', and said, 'when I knocked the knife down and hollered for you, they broke and run'. When I got outside, I didn't see nobody.

* * * " [Tr. 89]

Pickens then testified that they both went back in and had another beer. Approximately ten minutes later the deceased walked back outside, and perhaps three minutes later, the witness heard the shot. The deceased then said to Pickens, "man, they done shot me." [Tr. 91] When asked by the witness who had shot him, the deceased replied, "Them young punks shot me." Finally, the witness testified that defendant Carneil Lamar Davis had been present in the club earlier in the evening and at that time was wearing an orange-colored T-shirt and blue jeans.

On cross-examination the witness testified concerning the times of arrival at the supper club by the parties involved. He also was asked if the deceased had previously exhibited any large sums of money.

The State's next witness was Detective Harold Smith of the Ardmore Police Department. He testified that in his capacity as a police officer he had occasion to go to Lue's Supper Club at approximately 3:58 a. m. on July 28, 1975. When he arrived at the club he found a white male lying in front of the club with a wound in the neck. He then identified a picture of the deceased taken at the scene, which was admitted into evidence as State's Exhibit No. 1. After interviewing the witnesses at the scene and obtaining a general description of the two men seen running from the area, the detective went to the home of defendant Davis and arrested him. He testified that defendant Davis was wearing a pair of cutoff jeans when he opened the door of his home. Then the witness identified some blue jeans and an orange-colored T-shirt which he had recovered from the defendant's home. These were subsequently admitted into evidence. The witness then testified, without objection, that in his opinion the wound he observed on the deceased had been caused by a bullet and was approximately the size of a .38 caliber. He further testified that he later returned to the home of defendant Davis with a search warrant, where he found a .22 automatic rifle, a .38 caliber bullet and an empty holster.

On cross-examination, Officer Smith testified that after advising defendant Davis of his Miranda rights, he questioned the defendant about his whereabouts in the last few hours and that the defendant informed him that he had been in the company of a man named "Poncho." The cross-examination also revealed that the officer had previously stated, at the preliminary hearing, that he thought the bullet wound to the deceased had been caused by a .32 caliber bullet.

The next witness for the State was Milton L. Sanders of Ardmore, Oklahoma. He stated that he was twenty years old and knew defendant Davis and had gone to his home in the early morning hours of July 28, 1975, to borrow some cigarettes. After some fruitless questions asked by the District Attorney, the witness was declared by the trial court, without objection, to be hostile. The District Attorney then examined the witness as a hostile witness, concerning a written statement he had given the authorities concerning this case. This state-

ment was to the effect that he had seen a pistol in the hands of defendant Davis upon arriving to borrow the cigarettes and that defendant Davis had told him that he had shot a man.

On cross-examination Sanders related that he had given the statement when he was frightened, was concerned with being arrested and charged with murder, and hardly knew what he was doing.

The next witness for the State was James Franklin, a resident of Ardmore, who testified that he was eighteen years old and that he saw the defendant on July 27, 1975. He stated that the defendant took a .38 caliber Colt revolver from the trunk of his [Franklin's] car and that he did not see the defendant put it back. The witness Franklin next saw defendant Davis in jail on the morning of July 28th, where defendant Davis admitted shooting the deceased Ronnie Smith, "over some money."

Franklin also stated that on the morning of July 29, 1975, he spoke with co-defendant Goodlow in jail and was told by Goodlow that Davis had shot the deceased. Franklin further stated that he was told by co-defendant Goodlow that the gun had been given to a woman who had thrown it in a lake.

On cross-examination the witness admitted having been charged with Armed Robbery which was reduced to Grand Larceny and he was given a suspended sentence on that charge. He also admitted destroying property while in jail and contemplating suicide.

On re-direct examination, Franklin denied making any sort of deal for his testimony.

The State's next witness was Bill Culley, Assistant Chief of Police of the Ardmore Police Department, who testified that he went to the defendant's home early on the morning of July 28, 1975, and assisted in the arrest. He identified State's Exhibit No. 2 as the clothing the defendant admitted wearing earlier that night. The witness stated that the jeans were wet from the

knees down, and that it had been raining that night.

Dr. Fred Jordan, a forensic pathologist for the State of Oklahoma, was the State's final witness. He testified that he performed an autopsy on Ronald Smith and determined that the cause of death was from a gunshot wound to the neck.

At this time the State rested. The defendant's demurrer to the evidence was overruled.

The defendant, Carneil Lamar Davis, then testified in his own behalf. He related his activities on the night of July 27, 1975, and the morning of July 28, 1975, which did not include shooting Ronald Smith. While he was testifying on cross-examination, the State asked him to write down the answers to some questions on a piece of paper. On further cross-examination he stated that he wrote letters to Cheryl Hodge, but he denied asking her to fabricate an alibi for him.

The co-defendant, Garonski Goodlow, also testified as to his activities on the night in question. He denied having any part in the homicide and also denied ever having had a conversation with James Franklin while incarcerated in jail.

In rebuttal, the State called Carole Brooks, the Court Clerk of Carter County. She identified a copy of the Rules of the Carter County Jail.

Dean Plank, Deputy Sheriff of Carter County, was the State's second rebuttal witness. He also identified the Rules of the Carter County Jail which were admitted as State's Exhibit No. 6, and testified concerning the Rules, as follows:

"A. Concerning mail says, 'all mail, either incoming or outgoing will be censored by the Sheriff. Prisoners are not permitted to write more than one letter each day. Outgoing mail must be left open. Writing materials may be procured from the Sheriff.'" [Tr. 238]

The witness testified that these Rules were posted in the jail. He then testified to taking possession of a letter written by

the defendant on July 28, 1975, addressed to Cheryl Hodge. He stated that he made a photostatic copy of this letter which he gave to the District Attorney, while forwarding the original to Cheryl Hodge. The witness identified the copy which he had made and read the letter to the jury. The letter asked Cheryl Hodge to help in his defense by saying that both of them were at a party that night until 4:00 a. m., and also to have his cousin testify that he had been with the defendant shooting his rifle on Sunday. At the end of the letter there was a statement, "to be damned sure you all stick to the story."

■ As his first assignment of error, defendant alleges that the trial court committed error in admitting, over the defendant's objection, hearsay evidence which was both inadmissible and prejudicial to the defendant. Specifically, the defendant objects to the testimony of Johnny Pickens concerning evidence of an attempted robbery which took place in the parking lot ten to twenty minutes before the homicide. The defendant also contends this evidence was inadmissible because it tended to show the commission of an offense independent from the one with which he was charged. The trial court held this evidence admissible as coming under the res gestae exception to the hearsay rule. More than fifty years ago in *Warren v. State*, 24 Okl.Cr. 6, 215 P. 635 (1923), Judge Doyle, speaking for this Court, defined "res gestae":

"Res gestae are the circumstances, facts, and declarations which grow out of the main transaction or are contemporaneous with it, and serve to illustrate its character, including acts and words which are so closely connected therewith as to constitute a part of the transaction, and without a knowledge of which the main transaction might not be properly understood."

We have, on numerous occasions re-affirmed that definition. See, *Munn v. State*, Okl.Cr., 459 P.2d 628 (1969) and *Martin v. State*, Okl.Cr., 449 P.2d 275 (1969).

In the present case the statements made by the deceased to the witness Pickens concerning an attempted armed robbery occurred only ten to twenty minutes prior to the homicide. The parties and location were the same and the deceased stated that "two young punks" had just attempted to rob him. During the second conversation the deceased stated that his attackers were "them young punks," from which the jury could infer that the same parties committed both crimes. Since the defendant and the co-defendant were identified by witness Stephenson as having been sitting on the trunk of an automobile in the parking lot and the deceased stated to the witness Pickens that the men who attempted to rob him had been sitting on the trunk of a car, the jury could reasonably have concluded that the defendants were the parties to the first crime and subsequently the second crime. Further, in *Moulton v. State*, Okl.Cr., 476 P.2d 366 (1970), we held:

". . . [E]vidence of separate and similar offenses is admissible when it is material and proper to show (1) motive, (2) intent, (3) absence of mistake or accident, (4) *identity of person charged with the commission of the crime for which an accused is put on trial* . . ." [Emphasis added]

See, also *Kupiec v. State*, Okl.Cr., 493 P.2d 444 (1972).

We find that the admission of this evidence formed part of the res gestae, thereby coming under an exception to the hearsay rule, and the evidence of the attempted robbery was admissible to show the identity of the perpetrators of the crime charged. Therefore, defendant's first assignment of error is without merit.

The defendant alleges, in his second assignment of error, that the trial court erred by allowing into evidence the letter allegedly written by the defendant to his girl friend, while he was incarcerated. The defendant contends that this letter came into the possession of the Carter County Sheriff's Office as the result of an unlawful search and seizure, because the defendant was merely a pre-trial detainee, not a convicted prisoner and further that the defend-

ant's Fifth Amendment right against compulsory self-incrimination was violated by its admission.

We note that the letter was not introduced against the defendant in the State's case in chief. It was only after the defendant had testified in his own defense that the State introduced a photocopy of the letter as evidence in rebuttal. The defendant's testimony on cross-examination concerning this subject was as follows:

"Q. Did you ever write a letter to Cheryl Hodges [sic] and tell her to go talk to some of the witnesses here today?

"A. To go talk to my lawyer, to some of the witnesses, no, I never. I told her to talk to my lawyer about the night when we were together.

"Q. Did you ever write a letter to Cheryl Hodges [sic] and tell her to say you all had been at the party?

"A. I hadn't ever been to no party.

"Q. Did you ever writ that letter?

"A. Never wrote a letter like that, never did." [Tr. 202]

The letter in question reads, in part:

". . . Do you know where I'm coming from like I need you and Pat to tell them that we left the Hill about two in the moring. We went to my house. My cousin and Anne and James was already there when we got there. . . ." [Tr. 240]

In *Schneider v. State*, Okl.Cr., 538 P.2d 1088 (1975), this Court stated the purposes for which rebuttal testimony can be admitted, as follows:

". . . [R]ebuttal testimony may be offered to explain, repel, counteract, disprove, or destroy facts given in evidence by an adverse party, as well as to clarify a disputed point, notwithstanding that the same testimony might have been introduced in chief, and that the introduction of such evidence is a matter of discretion for the trial court which will not be a ground for reversal absent an abuse thereof. *Pulliam v. State*, 61 Okl.Cr. 18, 65 P.2d 426 (1937) and *Henderson v. State*, Okl.Cr., 389 P.2d 363 (1964). . . ."

When measured by the above standards, we are of the opinion that the introduction of the letter clearly was proper as it certainly did tend to disprove the prior testimony of the defendant and cast doubt on his credibility.

As to the issue of introducing unlawfully seized evidence inadmissible in the case in chief to be used for impeachment purposes, the United States Supreme Court in *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) held:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine [*Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652] would be a perversion of the Fourth Amendment."

More recently the United States Supreme Court reaffirmed this doctrine in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), when Mr. Chief Justice Burger, speaking for the majority, stated:

"It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder*. Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assum-

ing that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief."

See, also *Fosberry v. State*, Okl.Cr., 509 P.2d 911 (1973). Therefore it is apparent that we need not decide the constitutionality of the search and seizure of defendant's mail, since even assuming arguendo the seizure was unlawful, the evidence could be introduced in rebuttal to impeach the defendant's credibility as a witness. Since, according to the testimony, the Carter County Jail Rules were adequately posted in the jail and the letter was not admitted in the State's case in chief, we believe the claim of compulsory self-incrimination to be groundless. The defendant's second assignment of error is without merit.

The last assignment of error is that the trial court erred in denying the defendant's Motion for New Trial on the grounds of newly discovered evidence. The motion was heard on November 10, 1975, and denied. On January 9, 1976, the Motion for New Trial was once again urged and on this occasion the trial court heard testimony in support of the motion. Several witnesses were called on behalf of the defendant. Two of these witnesses testified that they were in the Carter County Jail at the same time that witness Franklin and defendant Davis were also incarcerated. These witnesses testified that either witness Franklin had told them that he committed the homicide or that the conversation between Franklin and defendant Davis never took place. Other witnesses testified at the Motion for New Trial, including one defense attorney, who testified that Franklin had told them that Davis had not been sincere and was joking when he admitted to Franklin that he had committed the offense. However, at this same hearing witness Franklin was called, at which time he stated that he had testified truthfully at the trial regarding the conversation between Davis and himself. At the conclusion of the testimony, the court heard the arguments of counsel; whereupon the trial court overruled the Motion for New Trial, stating in essence that the evidence presented by the defendant at the hearing on the motion went solely to the credibility of witness Franklin which was a matter for the consideration of the jury during the course of the trial. The court believed that his credibility was put in issue at the trial, and therefore this evidence was only cumulative as to the credibility of witness Franklin. Finally, the court found that the evidence, independent of Franklin's testimony, was more than sufficient to support the verdict of the jury. We agree with these conclusions. In *Thompson v. State*, Okl.Cr., 541 P.2d 1328 (1975), we stated:

"It was the duty of the trial court to weigh all of the evidence presented at the motion for new trial and the granting of a new trial on the ground of newly discovered evidence is a matter largely within the discretion of the trial court, and is not to be exercised except where there is the probability that, if such evidence had been introduced, different results would have been reached. See, *Walters v. State,* Okl.Cr., 403 P.2d 267 (1965)."

██ We are of the opinion that the evidence presented at the Motion for New Trial was an attempt to impeach the credibility of witness Franklin. Since there was sufficient independent evidence which would justify a conviction, we find no abuse of discretion in the trial court's denial of the Motion for New Trial.

Finding no error which would justify modification or reversal, the judgment and sentence appealed from is accordingly

*AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.