Andrew Thomas **LEDBETTER,**
Appellant,

v.

The **STATE of Oklahoma, Appellee.**

No. F–94–640.

Court of Criminal Appeals of Oklahoma.

Feb. 21, 1997.

Rehearing Denied March 25, 1997.

Sid Conway and Steve Barnes, Assistant Public Defenders, Tulsa, Trial Counsel, for Appellant.

Fred Demier, Assistant District Attorney, Tulsa, Trial Counsel, for Appellee.

Barry L. Derryberry, Assistant Public Defender, Tulsa, Appellate Counsel, for Appellant.

W.A. Drew Edmondson, Attorney General, Laronna W. Harris, Assistant Attorney General, Oklahoma City, Appellate Counsel, for Appellee.

### OPINION

LUMPKIN, Judge:

Appellant Andrew Thomas Ledbetter was tried by a jury in the District Court of Tulsa County, Case No. CF–93–1819, and convicted of Murder in the First Degree (21 O.S.1991, § 701.7(A)). The prosecution sought the death penalty, alleging (1) The murder was especially heinous, atrocious, or cruel (21 O.S.1991, § 701.12(4)) and (2) there existed a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1991, § 701.12(7)). The jury found the murder was especially heinous, atrocious or cruel but did not find Appellant posed a continuing threat to society. After making these findings, the jury recommended Appellant be sentenced to death. The trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals.[1]

In town for a church convention, John Ray Applewhite met Appellant at a local convenience store, and agreed to give him a ride. After being driven to a couple of locations, Appellant asked to go see a particular church minister. After a short visit (during which Applewhite waited in the car), Appellant came out, appeared distraught, and asked Applewhite to take him to the house where his estranged wife lived. Appellant went into the house while Applewhite again stayed in his car. As Applewhite fiddled with his car radio and enjoyed the unusually beautiful April day, he heard screams coming from the house. He looked up and saw a woman attempting to escape from the house; she was followed by Appellant, who appeared to be beating her with his fists while she con-

---

1. In so doing, we note the following: the Petition in Error in this case was filed November 30, 1994; Appellant's brief was filed November 1, 1995; the State's brief-in-chief was filed January 30, 1996; Appellant filed a reply brief February 20, 1996; and the case was submitted to this Court on February 9, 1996. Oral argument was held June 5, 1996.

stantly screamed. Appellant then stepped over the woman and returned to the car. In Appellant's hand was a bloody butcher knife. Fearing for his own safety, Applewhite took Appellant to another location. Next-door neighbors who were sitting on their front porch also heard the screams and noticed Appellant run out of the Ledbetter house carrying the knife. They went next door to check on Mrs. Ledbetter and found her lying near the front door with the metal rod of an ice pick sticking out of her right eye. She also exhibited other stab wounds caused by a knife. The ice pick punctured a major artery in the brain; the knife punctured a major artery feeding blood to the heart. She died within a short period of time. Appellant turned himself in that same day, April 21, 1993.

## I. ISSUES RELATING TO JURY SELECTION

For his first assignment of error, Appellant alleges his right to a fair trial was violated by the trial court's dismissal of jurors who potentially could set aside scruples against the death penalty.

 Appellant cites *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), where the United States Supreme Court determined the death penalty could not be carried out if the jury that imposed it had been selected by excluding for cause venirepersons who expressed general objections to the death penalty or conscientious or religious scruples against its infliction. Subsequently, however, in *Wainwright v. Witt,* 469 U.S. 412, 416, 105 S.Ct. 844, 847, 83 L.Ed.2d 841, 846 (1985), the Court recognized the State had a legitimate interest in excluding those whose opposition to capital punishment would not allow them to view the proceedings impartially, "and who therefore might frustrate administration of a State's death penalty scheme." As we noted in *Carter v. State,* 879 P.2d 1234 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995), the *Wainwright* Court "clarified its *Witherspoon* decision and held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on

capital punishment is 'whether the juror's views would prevent, or substantially impair, the performance of his duties as a juror in accordance with his instructions and his oath.'" *Carter,* 879 P.2d at 1243–44 (quoting *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–852). We further observed the Supreme Court dispensed with the reference in *Witherspoon* to "automatic" decision making and that "the new standard did not require that a juror's bias be proved with 'unmistakable clarity.'" *Carter,* 879 P.2d at 1244. We concluded that Supreme Court decisions "require that jurors be willing to go into the trial with no preconceived notions of either stance, death or life," and that was the same standard applied by this Court, that "a venireperson is only required to be willing to consider all the penalties provided by law and not be irrevocably committed before the trial has begun." *Id.* In applying this standard, we look to the entirety of the voir dire examination to determine if the trial court acted properly in excluding the juror for cause. *Id.* We have also observed that some veniremen could not be asked enough questions to establish such a record; nonetheless a judge may have a definite impression that the prospective juror would be unable to properly fulfill his or her oath. *Duvall v. State,* 825 P.2d 621, 631 (Okl.Cr.1991), *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). It is for this reason we give great deference to the trial judge, who was present during questioning and who evaluated the venireperson's attitude and demeanor during voir dire. *Allen v. State,* 871 P.2d 79, 91 (Okl.Cr.), *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994). With these principles in mind, we turn to the specific instances of which Appellant complains.

██ Appellant first complains the court erred in excusing for cause venireperson Broussard. Ms. Broussard first told the judge she had just been excused from a capital case in another courtroom where jury selection was transpiring. After the court told her she would not necessarily be excused in his courtroom based on that fact, she said she could never consider the death penalty, even though she knew that was one of the

three options available. She based this on both religious and philosophical reasons. When asked by defense counsel if there may be a crime that was so horrible she would not want that person walking around, she acknowledged a theoretical possibility she could consider death, but added she did not want to make the decision, and said she was not certain she could give it as much consideration as she would give the other two options. She repeated to the prosecutor she did not know if she could ever vote for the death penalty, and would choose another option if she were the one making the decision.

We find no error here. Although Ms. Broussard said there may be a theoretical situation where she would want a person to die for the crimes he committed, she would not be the one to chose the death option. We hold the responses "sufficiently demonstrated that [the juror's] beliefs about capital punishment would 'substantially impair [her] ability to serve as a juror.'" *Battenfield v. State,* 816 P.2d 555, 559 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992) (quoting *Coleman v. Brown,* 802 F.2d 1227, 1232 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987)).

■ The same is true of Venireperson Doerpinghaus. When the trial court asked him if he could consider the death penalty as one of three options available to him, he flatly stated "no," prompting the court to observe he "stated that fairly unequivocally [sic]." The court then attempted to ascertain if there might be any circumstances at all where he could consider death as an option. Citing religious reasons, Mr. Doerpinghaus said he could not. Although the questioning was very short, the trial court was obviously left with the definite impression Mr. Doer-

pinghaus would never consider the death penalty as a punishment option. We see no error here.

■ Appellant has cited other instances in the record, without specifics, where he claims the court erred in excusing venirepersons for cause. Venireperson Sims stated flatly she did not believe in the death penalty, and that she had always felt that way, saying that "because you can't give life, . . . I don't believe we have the right to take it." Venireperson Cook told the court he had very traumatic experiences while serving in Vietnam, he had "seen enough death and destruction," and could not think of a circumstance so horrible that he could impose the death penalty. Venireperson Holland, citing religious beliefs, was "absolutely certain" he could not consider the death penalty. The same philosophy was expressed by venireperson Campbell.

Based on the discussion of precedents above, we find no error in any of these rulings. Accordingly, Appellant's first proposition is without merit.

## II. ISSUES RELATING TO FIRST STAGE OF TRIAL

### A.

■ In his second proposition, Appellant claims the prosecutor improperly introduced evidence of his silence after being read his *Miranda*[2] warnings. Appellant cites *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which held a person cannot be penalized for asserting his right to silence by having that silence used against him.

The facts of this case dispose of Appellant's claim.[3] We agree with the State's

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The record shows the following exchange occurred at trial:

 Q. What caused you to have a meeting with Mr. Ledbetter?
 A. I was working the information window at the city jail that evening, and he had approached the window and stated who he was and that—
 Q. Who did he tell you he was?

 A. Andrew Ledbetter.
 Q. Okay. What else did he say, if anything?
 A. He stated that he would like to confess to a crime.
 Q. And what did you say?
 A. At that time, I went outside the—into the hallway where he was at, and again then asked him what he wanted to state.
 Q. And what did he say?
 A. That he had stabbed his wife.
 Q. Anything else?

response that, taken in context, the question appears to be more an attempt to ascertain whether the warnings were given at all, rather than attempt to show Appellant exercised his right to remain silent. *See Hardy v. State,* 562 P.2d 943, 946 (Okl.Cr.1977). Indeed, Appellant obviously did not exercise his right to remain silent, as he told the officer he had stabbed his wife. There is no indication from the record, and we find none, indicating the prosecutor elicited the information to penalize Appellant by showing the jury Appellant exercised his right to remain silent.

But had the prosecutor intended to introduce evidence of Appellant's sudden refusal to talk, there is no error. This Court has upheld the admission of testimony regarding this "sudden stoppage" as elicited by the prosecution in examining the investigative officer. *Robedeaux v. State,* 866 P.2d 417, 432 (Okl.Cr.1993), 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). As we said in *Rowe v. State,* 738 P.2d 166, 171 (Okl.Cr. 1987), "the appellant had waived his right to silence and did not effectively reassert it until his silence made it apparent that he no longer wanted to cooperate." *See also Hayden v. State,* 713 P.2d 595, 596 (Okl.Cr.1986) ("In this instance, there is no protected post-arrest silence since one 'who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.' ")

As an aside, Appellant complains the probative value of the evidence was substantially outweighed by its prejudicial effect. However, he has failed to show how this is so, and he has failed to support his contention with relevant caselaw. Having reviewed for plain, reversible error, *Simpson v. State,* 876 P.2d 690, 700–01 (Okl.Cr.1994), we find none. This assertion is groundless.

A. He said they had an altercation and she had come at him and didn't know what else to do and that he had stabbed her.
Q. Do you remember anything else he said?
A. No, sir.
Q. What did you do next?
A. At that time, we went through C door, which goes into the booking area, and I proceeded to book him at that time.
Q. Did you do anything else with him?

## B.

■ In his third proposition of error, Appellant contends color photographs were improperly introduced, as their probative value was substantially outweighed by their danger of unfair prejudice. The photographs in question were taken by the medical examiner before the autopsy was conducted. One shows a lateral view of the right side of the victim's head, and a metal rod sticking out of the right eye. Another shows a stab wound near the armpit. Yet another shows a stab wound to the abdominal region. Very little, if any, blood is contained in any of the photographs.

We find no error. The photographs are relevant because they tend to dispute Appellant's contention he had no intention of killing the victim. They show wounds inflicted by both an ice pick and a butcher knife. Each of these instruments inflicted a wound which by itself would have been fatal. That two separate instruments were used refutes Appellant's claim he had no intention of killing his wife. The photographs are therefore relevant, and their probative value is not substantially outweighed by prejudicial effect. 12 O.S.1991, § 2403. Accordingly, this proposition is without merit.

## C.

For his fourth proposition of error, Appellant contends the trial court erred in not allowing the jury to consider a lesser included offense of first degree manslaughter. He admits the court gave an instruction on heat-of-passion manslaughter. He also admits defense counsel did not request other manslaughter instructions. He nonetheless contends the court *sua sponte* should have given instructions dealing with other forms of manslaughter. We disagree.

A. Well, we go through the search and set him on the bench and I did my paperwork. Other than that, no.
Q. Did you give him his so-called *Miranda* warnings.
A. Yes, sir.
At that point an objection was made, and the attorney withdrew the question. No request for admonishment was made, and none was given. The prosecutor announced he had no further questions (Tr. 575–77).

## 1.

Appellant first complains the court erred in giving a first degree manslaughter instruction which was not in the form he requested. The instruction in question, number 11, tells the jury the crime of murder embraced the lesser degree of homicide known as first degree manslaughter. It then quoted the statutory definition.[4] It is therefore in substantial compliance with both the law and Appellant's theory of his case. *Holt v. State*, 278 P.2d 855, 857 (Okl.Cr.1955).

Appellant admits the court did give other instructions on first degree manslaughter which "tracked the applicable OUJI's" (brief of Appellant at 22–23) as instructions 12 through 17, but contends they were nevertheless incorrect. He cites *Camron v. State*, 829 P.2d 47 (Okl.Cr.1992), in support of his position that the element of "by means of a dangerous weapon" is inapplicable to heat of passion manslaughter.

Appellant's interpretation of dicta in *Camron* is incorrect. Rather, the applicable case is *Brown v. State*, 777 P.2d 1355, 1357 (Okl. Cr.1989), where we held heat of passion is an element of the jury instruction for first degree manslaughter by means of a dangerous weapon. In doing so we overruled *Smith v. State*, 652 P.2d 303 (Okl.Cr.1982) and *Moody v. State*, 38 Okl.Cr. 23, 259 P. 159 (1927), cases which reflect Appellant's now-incorrect interpretation of the law. This, along with the fact Appellant himself requested the instruction with which he now finds fault, renders this portion of Appellant's proposition meritless.

4. The portion of the statute reads:

Homicide is manslaughter in the first degree in the following cases:

. . .

2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

21 O.S.1991, § 711(2).

5. The portion of the statute reads:

Homicide is manslaughter in the first degree in the following cases:

. . .

## 2.

Appellant next complains the court erred in failing to give an instruction concerning subsection 3 of Section 711, which defines the crime as one perpetrated unnecessarily either while resisting criminal attempt by the victim or after the attempted crime failed.[5] Where the evidence does not reasonably support a conviction on the lesser included offense, or where the evidence provides no support for the defendant's theory of the case, then the instructions should not be given. *Hooker v. State*, 887 P.2d 1351, 1361 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); *Duvall*, 825 P.2d at 627.

We agree with the trial court there was no basis for giving the instructions. Here, there was no real evidence to support such an instruction. Appellant himself took the stand. There, instead of presenting the defense he attempted to present via cross-examination of prosecution witnesses and now presents on appeal, he offered contradictory and conflicting evidence by simply telling the jury he did not remember anything except he was there. This does not support the requested instructions, and there is no merit to Appellant's fourth proposition of error.

## III. ISSUES RELATING TO SECOND STAGE OF TRIAL

### A.

During the second stage of the trial, prosecutors introduced victim impact evidence in the form of a written statement, read by the victim's brother, Sgt. A.B. Thomas, Jr.[6] Ap-

3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed.

21 O.S.1991, § 711(3).

6. The statement told of the victim's dedicating her life to Christ at an early age. It also described her as a "loving and caring person who touched the hearts of many," observing that after her death the family received over 800 sympathy cards, some from total strangers. The brother described the victim's murder as "still such a shocking and devastating memory to this family that it permeates every aspect of our daily lives." He told how the murder, described as a "selfish act," affected his father, "whose once spirited

pellant objected at trial, and claims on appeal (1) the court erred in allowing characterizations of the crime and recommendation of punishment; (2) many other comments were either irrelevant or inflammatory; (3) the improper evidence improperly influenced the jury in determining sentence; and (4) he received inadequate notice of the statement.

### 1.

We addressed victim impact evidence at some length in *Cargle v. State*, 909 P.2d 806 (Okl.Cr.1996). There, we noted that the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) had overruled *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) and *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), cases which held victim impact evidence violated the protection against cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution; and that there was no *per se* constitutional bar to the use of such evidence.

In *Cargle* we discussed how *Payne* impacted on 22 O.S.Supp.1993, § 984,[7] which de-

voice could be heard preaching" but who now "just sits distant from all, with frequent nightmares." In describing some of the individual problems suffered by family members, the brother observed one child suffered from bed wetting and lack of sleep. The child had told the brother "that my mom was butchered like an animal. This child was very angry and wishes it can sleep and not feel so depressed at all times." One child described the impact of the death as a "completely devastating and life-altering experience." One did not eat dinner for three days. The child said

> I cry every day sometimes with my brothers and sisters or cousins and sometimes alone. I do not sleep through a single night and think that a part of me died when my momma was killed. I do not find with joy in anything and my powers of concentration are good. I feel as if my brain is on overload. I saw the bloody carpet and felt like getting down on the rug and holding my momma.

> I remember him saying that he would kill my momma some—I remember him saying that he would kill my momma and somehow I knew in my heart he meant it. But she just continued to love him and try to help him.

> I become noticeably withdrawn and depressed sometimes. I fall asleep at school. Wherever I go I see my momma and hear my momma. This fear happens every day. I cannot look at kitchen knives without being reminded. I no longer watch movies with body stabbings in it. I am now very suspicious of people and never was before. But now I am and I know my brothers and sisters and cousins are making an effort to be more outgoing.

The brother added his family suffered as much as the children, despite getting professional help. He also described the financial burden which continued to mount as a result of having to care for some of the victim's children, and the difficulty of restructuring his own family's lifestyle to accommodate the added burden.

He added his family had found strength in each other, and he vowed the children would not be taught to hate, even though it was "doubtful they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their mother was murdered and taken away from them." He closed with the following:

> To the ones you say you love, your wife and your children, this is an act of malice aforethought, was committed. What this family wants is for you to accept full responsibility for your action, which you feel no remorse or accept, and believe that this can be done through swift and just punishment, the death sentence.

> As I sit here thinking of Irena and the talks we had, this verse came to me. Psalms 40 in the first [sic]. I waited patiently for the Lord. He inclined to me and heard my cry. God said he wouldn't put any more on us than we can bear. The word tells us to come unto ye [sic]. The word tells us to come unto me all ye that labor and are heavy laden and I will give you rest. For my yoke is easy and my burden is light.

> Well, Irena gave her burden and suffering to God and now she's at rest in perfect peace. A person one is gone from us [sic], a voice we love is still. A piece [sic] is vacant in our home that could never be filled. Safe in the arms of Jesus, safe in his gently breast. Sweatly [sic] her soul shall rest. Praise unto God who giveth us the victory in Jesus our Lord. The best and most beautiful things in the world cannot be seen or touched but are felt in the heart.

The prosecution struck a portion of the statement characterizing Appellant as unremorseful and not subject to rehabilitation. The defense did not cross-examine the witness.

7. That statute reads in pertinent part:

> 1. "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence; . . .

fines the scope of victim impact evidence. We observed the statutory language clearly dictated the evidence should be restricted to the " 'financial, emotional, psychological, and physical effects,' or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim." *Cargle*, 909 P.2d at 828. We cautioned that evidence should not be lengthy, adding

> its use should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed....; victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family.

*Id.* With these precepts in mind, we now turn to the evidence adduced at trial.

### 2.

■■■ We find no error in allowing evidence [8] the victim was a loving and caring person whose death brought responses from several hundred people. We also find no error in testimony that the victim's death profoundly affected her children, in the form of bed wetting, loss of sleep or appetite, profound mood changes, or the general statement that the death was a "completely devastating and life-altering experience." Likewise, we see no error in the jury's becoming aware that the death posed a financial hardship on other family members, who were forced to change their way of living to accommodate the victim's children. Neither do we find particular fault with exposition of the victim's religious preferences, so long as this evidence does not dominate the statement.

8. The form of that evidence and other examples cited here, insofar as it was appropriated from victim impact evidence which was included in an appendix to *Booth*, is addressed below.

9. Indeed, the only case quoted in that section was contained in a paragraph following a summary of the evidence presented:

Such findings do not dispose of other comments, however. The brother described the murder as a "selfish act"; related one child's opinion that his mother was "butchered like an animal"; described the murder as "brutal"; and recalled one child's memory that Appellant had threatened to kill the victim and "somehow I knew in my heart he meant it." Additionally, there is the comment which seems to be addressed directly to the Appellant during the trial, accusing him of accepting no responsibility and showing no remorse for his actions and expressing the belief the death penalty was a "swift and just" punishment. All of these comments could be described as characterizations and opinions about the crime, the defendant and the appropriate punishment. The *Payne* Court specifically acknowledged its holding did not affect prior rulings prohibiting the use of such evidence. *See Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2, 115 L.Ed.2d at 739 n. 2. We acknowledged this in *Cargle*. 909 P.2d at 827 n. 14. The introduction of such evidence here necessitates that we examine whether such evidence is permissible under existing caselaw.

### 3.

■■■ The Supreme Court declined to address the effect of *Payne* on the *Booth* and *Gathers* cases as it related to characterizations and opinions about the crime, the defendant and the appropriate punishment; however, from a reading of *Booth*, it seems clear that, in light of the discussion in *Payne*, whatever ban against this evidence there may be does not lie in the Eighth Amendment. In *Booth*, the entire discussion dealing with family members' opinions and characterizations of the crimes was covered in two paragraphs, after an extended discussion of the other victim impact evidence, and appeared based on the same rationale. *See Booth*, 482 U.S. at 508–09, 107 S.Ct. at 2535–36.[9] Based on a review of these cases, *stare*

> One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and

*decisis* appears to dictate since the Eighth Amendment rationale supporting the ban of the other victim impact evidence in *Booth* was overruled in *Payne*, this portion was also overruled, insofar as it had its roots in the Eighth Amendment.

#### 4.

That does not dispose of the issue, however. We noted in *Cargle* that, even though there was no Eighth Amendment bar to the introduction of victim impact evidence, there was a possibility evidence could be introduced that was "so unduly prejudicial that it renders the trial fundamentally unfair," thus implicating the Due Process Clause of the Fourteenth Amendment. *Cargle*, 909 P.2d at 826 (quoting *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735).

#### 5.

The same is true of opinion evidence. The Legislature has defined the type of evidence which is admissible in criminal trials in the district courts of this State, and the procedure governing the use of that evidence. *See* 12 O.S.1991, §§ 2101–3103. By enacting Section 984 of Title 22, the Legislature has in effect declared such evidence both relevant and admissible. We are bound by that decision.

■ However, that does not end the discussion. As with any evidence sought to be admitted, the district court must decide whether its probative value is substantially outweighed by its prejudicial effect. 12 O.S. 1991, § 2403. This in and of itself more narrowly defines the victim impact evidence which a jury may hear.

■ In making the assessment whether to admit opinion evidence in a victim impact statement during the second stage of a capital case, the trial court must use extraordinary care. We stated in *Cargle*, 909 P.2d at 829, that the evidence must allow the

sentencer to make a "reasoned moral response based on reason and reliable evidence" that a particular defendant deserves death. The same is true of evidence in a capital murder case in which a person gives an opinion as to the appropriate punishment: while theoretically admissible, this evidence will be viewed by this Court with a heightened degree of scrutiny as we apply the probative-value-versus-prejudicial-effect analysis. Any opinion as to the recommended sentence should be given as a straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification.

■ Here, the admission of that evidence was, at least in part, error. Using the above discussion as a basis, there was nothing improper in Sgt. Thomas's giving his belief the death penalty was an appropriate punishment: that is an "opinion of a recommended sentence." 22 O.S.Supp.1993, § 984.

However, Sgt. Thomas also described the murder as a "selfish act"; related one child's opinion that his mother was "butchered like an animal"; described the murder as "brutal"; and recalled one child's memory that Appellant had threatened to kill the victim and "somehow I knew in my heart he meant it." These comments are not opinions of a recommended sentence or within the other specified evidence allowed under Section 984; hence, they were improperly admitted.

Another reason this statement was improper is discussed below.

#### 6.

■ This Court in a supplemental Order ordered the parties to address another aspect of the victim impact evidence: some profoundly disturbing similarities between the victim impact statement read by the victim's brother and the victim impact statement given to the jury in *Booth*, 482 U.S. at 509–15, 107 S.Ct. at 2537–39.[10] The issue is

---

the defendant. As we have noted, any decision to impose the death sentence must "be, and appear to be, based on reason rather than caprice or emotion." [citation omitted]. The admission of these emotionally charged opinions as to what conclusions the jury should

draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases.
*Id.* at 508–09, 107 S.Ct. at 2536.

**10.** The following are examples:

properly before us because Appellant complains many of the statements are improper.

*Tr. 699* ("That child stated that my mom was butchered like an animal.")

*Booth*, 482 U.S. at 512, 107 S.Ct. at 2537, 96 L.Ed.2d at 454 ("The victims' son feels that his parents were not killed, but were butchered like animals.");

*Tr. 699* ("This child was very angry and wishes it can sleep and not feel so depressed at all times")

*Booth* at 512, 107 S.Ct. at 2537, 96 L.Ed.2d at 454 ("He is very angry and wishes he could sleep and not feel so depressed all the time.");

*Tr. 699* ("Perhaps this child best describes the impact of the tragedy most eloquently when stating that it was a completely devastating and life-altering experience.")

*Booth* at 511, 107 S.Ct. at 2537, 96 L.Ed.2d at 454 ("Perhaps she described the impact of the tragedy most eloquently when she stated that it was a completely devastating and life altering experience.");

*Tr. 699–700* ("One child did not even eat dinner for three days following Irena's death. This is the reaction from one child. I cry every day sometimes with my brothers and sisters or cousins and sometimes alone. I do not sleep through a single night and think that a part of me died when my momma was killed. I do not find with [sic] joy in anything and my powers of concentration are [sic] good. I feel as if my brain is on overload. I saw the bloody carpet and felt like getting down on the rug and holding my momma.")

*Booth* at 512, 107 S.Ct. at 2538, 96 L.Ed.2d at 454 ("The victims' daughter and her husband didn't eat dinner for three days following the discovery of Mr. and Mrs. Bronstein's bodies. They cried together every day for four months and she still cries every day. She states that she doesn't sleep through a single night and thinks a part of her died too when her parents were killed. She reports that she doesn't find much joy in anything and her powers of concentration aren't good. She feels as if her brain is on overload. The victims' daughter relates that she had to clean out her parents' house and it took several weeks. She saw the bloody carpet, knowing that her parents had been there, and she felt like getting down on the rug and holding her mother.");

*Tr. 700* ("I become noticeably withdrawn and depressed sometimes. I fall asleep at school. Wherever I go I see my momma and hear my momma. This fear happens every day. I cannot look at kitchen knives without being reminded. I no longer watch movies with body stabbings in it. I am now very suspicious of people and never was before. But now I am and I know my brothers and sisters and cousins are making an effort to be more outgoing.")

*Booth* at 512–13, 107 S.Ct. at 2538, 96 L.Ed.2d at 454 ("The victims' daughter reports that she had become noticeably withdrawn and depressed at work and is now making an effort to be more outgoing. She notes that she is so emotionally tired because she doesn't sleep at night, that she has a tendency to fall asleep when she attends social events such as dinner parties or the symphony. The victims' daughter states that wherever she goes she sees and hears her parents. This happens every day. She cannot look at kitchen knives without being reminded of the murders and she is never away from it. She states that she can't watch movies with bodies or stabbings in it.");

*Tr. 701* ("What this family wants is for you to accept full responsibility for your action, which you feel no remorse or accept, and believe that this can be done through swift and just punishment, the death sentence.")

*Booth* at 514, 107 S.Ct. at 2539, 96 L.Ed.2d at 456 ("This is a constant reminder to him. The family wants the whole thing to be over with and they would like to see swift and just punishment.");

*Tr. 698–99* ("Her murder is still such a shocking and devastating memory to this family that it permeates every aspect of our daily lives.")

*Booth* at 515, 107 S.Ct. at 2539, 96 L.Ed.2d at 456 ("It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives.").

Appellate defense counsel presented another example to this Court: *Tr. 698* ("Irena was a loving and caring person who touched the hearts of many. This was very evident by her funeral being one of the largest in the funeral home. The family received over 800 sympathy cards. Some from total strangers. A loving devoted mother whose family was most important to her.")

*Booth* at 514, 107 S.Ct. at 2539, 96 L.Ed.2d at 456 ("[T]he Bronsteins were loving parents and grandparents whose family was most important to them. Their funeral was the largest in history of the Levinson Funeral Home and the family received over one thousand sympathy cards, some from total strangers.")

Appellate counsel also pointed out a second example, that one of the children believed Appellant "is not remorseful for what he done and can never be rehabilitated." (*Tr.682*). Cf. *Booth* at 513, 107 S.Ct. at 2539, 96 L.Ed.2d at 455 ([One of the victims' children] "doesn't feel that the people who did this could ever be rehabilitated"). However, this last statement was edited out by the prosecutor before it was read to the jury. Consequently, its inclusion, though useful to show similarities between Sgt. Thomas' statement and that in *Booth*, was not heard by the jury, and therefore could not have had an impact on the jury's decision.

Following oral argument, this Court directed the District Court to hold an eviden-

tiary hearing to determine the source of the victim impact statement.[11] Following that hearing, the District Court issued its findings of fact. It appears from the record that Sgt. Thomas went to the library on his own, found victim impact evidence in an appendix to *Booth* itself, then copied passages of that evidence into his own statement, which he read to the jury. Despite the witness's appropriating passages and implying they were his own, the district court found the views expressed in Sgt. Thomas's victim impact statement were consistent with the actual impact of Irena Ledbetter's death on members of her family. The court also found Sgt. Thomas received no help in preparing his statement.

We recognize there is no specific prohibition against a preparer's using other sources as a "guide" to compose a victim impact statement. Indeed, a broad reading of the statutes relating to victim impact statements would seem to allow virtually anyone to prepare and present them. In addition to Section 984 of Title 22, discussed above, Section 984.1 of Title 22, which deals with the presentation and use of a victim impact statement at a sentencing proceedings, states that the victim, members of the victim's immediate family "or person designated by the victim or by family members of the victim," may present a statement or appear at the sentence proceeding and present the statements.

Despite this language, we cannot find it was the intent of the Legislature that a person chosen to present the victim impact statement should be allowed to use sources other than that person's own thoughts or observations to express the impact of a death on survivors of the victim. To "borrow" from another source or person would be to admit that the "unique characteristics which define the individual who has died," *Cargle*, 909 P.2d at 828, are in reality no different from the "unique characteristics" of any other victim. To hold one person is no more unique than another is to eviscerate the foundation upon which victim impact evidence is based.[12] This we shall not do.

■■■■■ We therefore hold that the person chosen to prepare a victim impact statement cannot receive aid in the composition of that statement from any outside sources, including personnel in the prosecutor's office or statements gleaned from other texts or sources. This, of course, does not extend to that person's ability to observe family members and use those observations in the statement. Our holding is limited to restricting the use of "ghost writers" or other texts or sources [13] from which pertinent information presented to the sentencer could be copied and advanced as the writer's own work. We do not hold or infer the district attorney should not review any prepared statements and redact any inadmissible terminology from the document. The point at which the

---

**11.** On June 5, 1996, the Attorney General tendered for filing a Motion to Supplement the Record, which contained affidavits from the prosecutor and victim witness coordinator in this case concerning their lack of input into the victim impact statement read by Sgt. Thomas at trial. In light of the fact a hearing was held, the Motion to Supplement is denied as moot.

**12.** This interpretation is buttressed by 19 O.S.Supp.1993, § 215.39, which dictates the prosecutor must prepare a written narrative report describing the crime and any factors which might enhance or diminish the gravity of the offense; yet also specifically orders this narrative to be provided to corrections authorities along with the judgment and sentence "and any victim impact statements presented to the court in the case." The clear delineation between the separate documents indicates their separate characteristics and sources. Such an interpretation is consistent with existing authority from this Court. We have long held that statements by the

prosecutor in a case are not evidence to be considered by the jury. *Neill v. State*, 827 P.2d 884, 887 (Okl.Cr.1992). Allowing a prosecutor to prepare the victim impact statement would be effectively allowing a closing argument to be entered as evidence in a case. Here, the trial court found—and we accept that finding—the victim's brother who read the statement received no help from the prosecutor's office. We point out this existing law only to show one possible example why outside assistance in writing the statement itself would be prohibited.

**13.** Using text from an existing opinion is particularly dangerous. Often, material quoted in an opinion is presented, not because it is a good example of something *proper*, but because it is a good example of something *improper*, a distinction which might not be realized by a person unskilled in the law. In *Booth*, for instance, the Supreme Court quoted text which it specifically found violated a provision of the Constitution of the United States.

statement and its sources must be presented to defense counsel are discussed below.

### 7.

■ In the third portion of Appellant's fifth proposition, he argues there is no objective standard to guide the jurors in their utilization of the victim impact evidence. Appellant admits in his supplemental brief this Court has provided that guidance in *Cargle,* 909 P.2d at 828–29, but notes is it not retroactive. This Court is capable of reviewing the evidence under the proper standard, utilizing guidelines we have since promulgated.

### 8.

■ Appellant next complains he received inadequate notice of the victim impact evidence. In support, he cites 21 O.S.Supp. 1992, § 701.10, which requires advance notice of evidence to be used in aggravation. We have determined victim impact evidence is not the same as an aggravating circumstance, *see Cargle,* 909 P.2d at 828 and 828 n. 15. Accordingly, authority to that effect cited by Appellant is inapplicable.

That does not end the discussion, however, because we noted in *Cargle* that the prosecutor should file a Notice of Intent to Produce Victim Impact Evidence, detailing the evidence sought to be introduced. *Id.* (citing *Mitchell v. State,* 884 P.2d 1186, 1204 (Okl. Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995)); *see also* 22 O.S.Supp.1993, § 984.1(C) (requiring the trial court to make copies of victim impact statements "available to the parties"). We also noted an in-camera hearing should be held by the court to determine the admissibility of the evidence.

Here, defense counsel acknowledged she had received notice that the victim's brother "would testify about the impact that Irena's death had on him and his family"; however, defense counsel said she did not know what that testimony would be. The record shows the prosecution filed before trial a "Notice of Evidence in Aggravation." The only indication a victim impact statement would be introduced was the statement the victim's brother "will testify he is the brother of Affie Ledbetter and the impact her death has had

on him and his family." Defense counsel was given a copy of the report right before the second stage of the trial began.

This case provides a clear illustration why advance notice is desirable. Had defense counsel been provided a copy of the statement beforehand, she would have been able to inspect the statement and perhaps discover the similarities between it and the victim impact statement listed in the appendix to *Booth.*

■ We did not have to address this question in *Cargle,* as the prosecutors provided advance notice of the victim impact evidence. However, we find unacceptable a scenario such as the one found in this case, where the prosecutor's office was typing up the statement as the second stage was beginning. Despite the focus we give the statement here and in *Cargle,* the trial court and attorneys must remember that a victim impact statement is nothing more than evidence, subject to the same limitations and procedures as other evidence. Accordingly, we hold that, when properly requested and ordered by the court, victim impact evidence must ordinarily be turned over to the opposing party at least ten (10) days before trial. 22 O.S.Supp.1994, § 2002(D).

■ Appellant also observes that *Cargle* requires a notice "detailing" the evidence sought to be introduced at trial. Appellant has provided no suggestions to this Court as to how "detailed" a report should be, and we refuse to set forth a bright-line rule delineating the specificity which must be contained within a victim impact statement. As with other evidence, a victim impact statement will be unique in each case, each with its own characteristics and concerns. We trust that prosecutors will adhere to their oaths as officers of the court and not engage in unethical tactics; and, when requested to do so on appeal, this Court will analyze the specificity of such a statement. It is sufficient to observe that the notice in the case *sub judice* did not provide adequate detail.

The effect of the errors contained in this proposition is more fully evaluated in the

Mandatory Sentence Review, below. *Cargle,* 909 P.2d at 829.

### 9.

■ As this case must be remanded for a new sentencing hearing, there is another aspect of this particular victim impact statement which must be addressed. In another, contemporaneous case, we noted that unless a hearsay statement falls within one of the recognized exceptions to the rule against hearsay or is within the realm of the witnesses' personal knowledge, it would be just as inadmissible in a victim impact statement as it would in any other form of evidence presented at trial. *See Conover v. State,* 933 P.2d 904 (Okl.Cr.1997). As this case must be reversed on other grounds, we point this out here to alert the trial court to certain statements made in this case which appear to be improperly admitted. While reading his statement, Sgt. Thomas inserted several instances of what appear to be hearsay.[14] The reference to hearsay statements contained in this statement forces us to examine to what extent they are admissible in the punishment stage of a capital proceeding.

Under the strictest reading of the Evidence Code, the rule against hearsay statements is not applicable in a sentencing proceeding. *See* 12 O.S.1991, § 2103(B)(2). However, this Court has limited the language of this subsection, holding that the Rules of Evidence do apply to some extent in second-stage proceedings in capital cases. *Castro v. State,* 745 P.2d 394, 407 (Okl.Cr.1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988); *Chaney v. State,* 612 P.2d 269, 279 (Okl.Cr.1980), *cert. denied,* 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981). We find nothing in 22 O.S.Supp.1993, §§ 984 & 984.1(A) which indicates a Legislative intent to overturn these holdings.[15]

There is also the matter of the Confrontation Clause of the Sixth Amendment to the United States Constitution[16] and Art. II, § 20 of the Oklahoma Constitution.[17] Application of the Confrontation Clause to punishment proceedings in capital cases is not clear; however, decisions of the United States Supreme Court do make it clear through a Due Process analysis that the imposition of a death sentence based on information which a defendant does not have the opportunity to deny or explain may also run afoul of the Confrontation Clause. *See Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346

---

14. In one instance he told the jurors one child "stated that my mom was butchered like an animal. This child was very angry and wishes it can sleep and not feel so depressed at all times." Another child "best describes the impact of the tragedy most eloquently when stating that it was a completely devestating and life-altering experience." In another instance, he quoted the child as saying "I cry every day sometimes with my brothers and sisters or cousins and sometimes alone. I do not sleep through a single night and think that a part of me died when my momma was killed. I do not find with joy [sic] in anything and my powers of concentration are good [sic]. I feel as if my brain is on overload. I saw the bloody carpet and felt like getting down on the rug and holding my momma. .... I remember him saying that he would kill my momma and somehow I knew in my heart he meant it. But she just continued to live him and try to help him. I become noticeably withdrawn and depressed sometimes. I fall asleep at school. Wherever I go I see my momma and hear my momma. This fear happens every day. I cannot look at kitchen knives without being reminded. I no longer watch movies with body stabbings in it. I am now very suspicious of people and never was before. But now I am and I know my brothers and sisters and cousins are making an effort to be more outgoing."

No objection was lodged below on this basis, and we need not determine which of these statements are admissible, and which are not.

15. There is language in 22 O.S.Supp.1993, § 984.1(B) which states that a person preparing a presentence investigation report "shall consult with each victim or members of the immediate family or a designee of members of the immediate family if the victim is deceased, ... and include any victim impact statements in the presentence investigation report." However, by its own plain language, this subsection deals with *presentence investigation reports,* which are intended to be used in non-capital cases at the time formal sentence is imposed. We do not have that issue before us.

16. Which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

17. Which provides that "[i]n all criminal prosecutions the accused ... shall be confronted with the witnesses against him...."

(1972). *See also United States v. Beaulieu,* 893 F.2d 1177 (10th Cir.), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990) (distinguishing *Gardner* and *Furman* in reaching its holding reliable hearsay may be used in a sentencing stage of a non-capital case). Regardless of the label used, statements used which are in violation of "the Constitution of the United States or of the State of Oklahoma" are not admissible. 21 O.S.Supp.1992, § 701.10(D). The statements listed above could fall into this category, as they appear to have been admitted to prove the truth of the matter asserted, and do not fall into one of the recognized exceptions to the rule against hearsay. *See* 12 O.S.1991, §§ 2803, 2804.

We are aware that the right of confrontation and the rule against hearsay statements are two different concepts and are not coextensive. *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970). However, as we remand for a new sentencing proceeding on other grounds, we need not explore these differences at this time. Here, it is sufficient to state that—whether one labels the statements here a violation of the Evidence Code prohibiting hearsay, a violation of the Due Process Clause of the Fourteenth Amendment, or a violation of the Sixth Amendment Confrontation Clause—a violation occurred here when the witness testified as to the impact on another person through the use of hearsay statements. The trial court is thoroughly capable of distinguishing between what is a violation and what is not,[18] and we leave the determination to that venue.

### B.

▮ In his sixth proposition of error, Appellant contends the evidence was insufficient to support the jury's finding the murder was especially heinous, atrocious or cruel. We disagree.

The medical examiner testified the victim exhibited wounds indicating she attempted to defend herself before suffering the wounds which proved to be fatal. The fact the victim unsuccessfully tried to defend herself was corroborated by testimony from Applewhite, who drove Appellant to the house and who heard screams coming from within the house while Appellant was inside. He then saw the victim attempt to escape from the house as Appellant followed and continued his assault. In addition, the aggravator is supported by the evidence Appellant stabbed the victim in the eye with an ice pick with sufficient force to break off the handle, as well as making several gashes with a butcher knife, including one which severed a major artery to the heart. There was also evidence that Appellant had tried to kill the victim with an ice pick less than a week before; therefore, it is likely the victim knew she was about to be assaulted again when she saw Appellant enter the house. Finally, there is evidence indicating the victim was still alive when her neighbor encountered her, and she may have attempted to communicate with the neighbor. The neighbor said the victim appeared to be unconscious, but when asked by the neighbor to give a signal she could hear, she breathed "real hard, just ahhh, and she did a few more breaths and I couldn't get anything else out of her."

In the light most favorable to the prosecution, *Bryson v. State,* 876 P.2d 240, 259 (Okl. Cr.1994), *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995), we find sufficient evidence to support the jury's finding the murder was especially heinous, atrocious or cruel. *See Powell v. State,* 906 P.2d

---

18. It seems clear that neither the Confrontation Clause nor the prohibition against hearsay would be violated if the statements were not offered for purposes other than to prove the truth of the matter asserted. *See* 12 O.S.1991, § 2801(3); *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (Confrontation Clause not violated by nonhearsay use of accomplice confession if that confession is used only to rebut a defendant's in-court testimony his own confession had been coercively derived from the accomplice's statement). Additionally, such statements may be admissible if they fall into one of the recognized exceptions to the rule against hearsay. *See Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). We need not determine which of these statements are admissible and which are not, as it is possible the statements will not be re-offered during the new proceeding. What is and what is not hearsay can be determined by a conscientious trial court, after receiving argument and authority of trial counsel.

765, 782 (Okl.Cr.1995); *Spears v. State,* 900 P.2d 431, 449 (Okl.Cr.1995); *Neill v. State,* 896 P.2d 537, 556–57 (Okl.Cr.1994); *Hawkins v. State,* 891 P.2d 586, 597 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408, 64 U.S.L.W. 3348 (1995). This proposition is without merit.

### C.

For his seventh proposition of error, Appellant contends the evidence in aggravation fails to outweigh the evidence offered in mitigation. This is addressed in the mandatory sentence review, below.

### D.

▉ For his eighth proposition of error, Appellant complains the trial court erroneously instructed the jury on the burden of proof necessary to find the aggravating circumstances alleged in the bill of particulars. In particular, he complains the court instructed the jury that it must find the "material" allegations of the aggravating circumstance before it could consider the death penalty.

▉ We first note Appellant submitted an instruction which is virtually identical to the one given by the trial court.[19] The trial court gave OUJI–CR 434.[20] If it were a mistake—and we do not hold it is—Appellant cannot profit from it, for it is his own invited error. *Kerr v. State,* 276 P.2d 284, 291 (Okl. Cr.1954); *Bush v. State,* 91 Okl.Cr. 30, 34, 215 P.2d 577, 580 (1950). Additionally, the trial court has an obligation to use the OUJI instructions when appropriate. *See Flores v. State,* 896 P.2d 558, 560 (Okl.Cr.1995); *Fontenot v. State,* 881 P.2d 69, 84 (Okl.Cr.1994); *Perez v. State,* 798 P.2d 639, 641 (Okl.Cr. 1990).

▉ Here, we find no error. In *Flores,* we held that, in instructing the jury on the elements of the crime, the court should instruct the jury the prosecution must prove each element of the crime beyond a reasonable doubt, not that the prosecution must prove the material allegations of the crime beyond a reasonable doubt, observing the latter "may be confusing." *Flores,* 896 P.2d at 558. Here, the instruction was used in

19. Appellant requested the following instruction, which he labeled as "OUJI–CR 434 (modified)":

You are instructed that Defendant has entered a plea of not guilty to the allegation of this Bill of Particulars, which casts on the State the burden of proving the material allegations in this Bill of Particulars beyond a reasonable doubt and that death is the only appropriate punishment.

This bill of particulars simply states the grounds upon which the state seeks imposition of the death penalty. It sets forth in a formal way the aggravating circumstances of which the defendant is accused. It is, in itself, not evidence that any aggravating circumstance exist, and you must not allow yourselves to be influenced against the Defendant by reason of the filing of this Bill of Particulars.

The Defendant is presumed to be innocent of the charge made against him in the Bill of Particulars, and innocent of each and every material element of said charge, and this presumption of innocence continues unless the aggravating circumstance is established beyond a reasonable doubt. If, upon consideration of all the evidence, facts and circumstances in the case, you entertain a reasonable doubt of the guilt of the defendant of the charge against him in the Bill of Particulars, you must give him the benefit of that doubt and return a sentence of life imprisonment or life without parole. (O.R.110).

20. That instruction reads as follows:

The defendant has entered a plea of not guilty to the allegation of this Bill of Particulars, which casts on the State the burden of proving the material allegations in this Bill of Particulars beyond a reasonable doubt.

This bill of particulars simply states the grounds upon which the state seeks imposition of the death penalty. It sets forth in a formal way the aggravating circumstances of which the defendant is accused. It is in itself, not evidence that any aggravating circumstance exist, and you must not allow yourselves to be influenced against the Defendant by reason of the filing of this Bill of Particulars.

The Defendant is presumed to be innocent of the charge made against him in the Bill of Particulars, and innocent of each and every material element of said charge, and this presumption of innocence continues unless the aggravating circumstance is established beyond a reasonable doubt. If, upon consideration of all the evidence, facts and circumstances in the case, you entertain a reasonable doubt of the guilt of the defendant of the charge against him in the Bill of Particulars, you must give him the benefit of that doubt and return a sentence of either imprisonment for life without parole or imprisonment for life. (O.R.180).

connection with the aggravating circumstance that the murder was especially heinous, atrocious or cruel. There are no "elements" as such: it is the aggravator itself which the prosecution had to prove to render Appellant eligible for the death penalty. It is the death penalty, not the individual aggravators, which the jury must find as the appropriate punishment for the defendant once the aggravator is proven. *Salazar v. State*, 919 P.2d 1120, 67 OBJ 1989, 1991–92 (Okl.Cr. 1996). The jury was informed what the individual terms mean, then told the phrase as a whole was "directed to those crimes where the death of the victim was preceded by torture or serious physical abuse." Therefore, the phrase "material allegation" more appropriately encompasses what the prosecution must prove.

This proposition is without merit.

### E.

For his ninth proposition of error, Appellant contends the definition of the heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague. This Court reiterated the proper standard in *Cheney v. State*, 909 P.2d 74, 80 (Okl.Cr.1995). Appellant's argument has not persuaded us we should change our mind. This proposition is without merit.

### F.

■ For his tenth proposition of error, Appellant contends the trial court erred in rejecting a proposed instruction specifying extreme mental or emotional disturbance as a mitigating circumstance. He points out that, although the court rejected this proposed mitigating circumstance, it was listed in the trial judge's report as such a circumstance. Appellant submitted the following proposed instruction to the court:

> You are instructed that the mitigating circumstance that the Defendant was under the influence of extreme mental and/or emotional disturbance is applied to a person who while not insane, has more than the emotion of an average man. It applies to the person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state.

Admitting on appeal that the proposed instruction "did not necessarily present the most ideal language," Appellant nevertheless argues his emotional and mental state constituted a substantial portion of his cross-examination of the prosecution's witnesses, and should have been given to the jury for its consideration. We agree. *See Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Given that the trial court listed it on his trial report as a valid mitigating circumstance, we are puzzled why he did not include it in the list of possible mitigating circumstances presented to the jury.

The effect of this error will be discussed in the mandatory sentence review, below.

■ Appellant also contends the instructions given to the jury dealing with mitigation[21] presented a risk the jury was unconstitutionally precluded from considering all relevant mitigation. He claims that by not inserting language to the effect the sentencer can consider "any mitigating circumstances," the court improperly channeled the sentenc-

---

21. Instructions on mitigation given to the jury were as follows:

> Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

(O.R.184). The jury was also given the following:

> Evidence has been offered on behalf of the defendant as to the following mitigating circumstances:

[listed]

> Whether these circumstances existed, and whether these circumstances are mitigating, must be decided by you.

(O.R.185–86). Also:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.

(O.R.187).

er's discretion to consider mitigation. He also contends that by prefacing the list of specific proposed mitigating circumstances with the words "[e]vidence has been offered" implied that there was no evidence to support any other mitigating evidence the jurors might believe existed.

The instructions given by the court mirrored those which the law requires the court to give. *See* OUJI–CR 438–440. We believe the instructions, when read as a whole, properly instruct the jury it could consider anything it considered to be a mitigating circumstance, and there is no "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *See Boyde v. California,* 494 U.S. 370, 378, 380, 110 S.Ct. 1190, 1196, 1198, 108 L.Ed.2d 316 (1990).

Appellant also complains second-stage instructions permitted the jury to decline consideration of mitigating evidence. We addressed this issue in *Pickens v. State,* 850 P.2d 328, 339–40 (Okl.Cr.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994). We shall not address it again.

### G.

For his eleventh proposition of error, Appellant claims there was an unconstitutional likelihood the jury interpreted the instructions as requiring unanimity on mitigation. We have previously addressed this complaint and have found it wanting. *See Mayes v. State,* 887 P.2d 1288, 1320 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995); *Harjo v. State,* 882 P.2d 1067, 1081 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995); *Stiles v. State,* 829 P.2d 984, 997

(Okl.Cr.1992). Appellant has presented nothing showing us why we should change our minds.[22]

### H.

Appellant next claims the instructions as given unconstitutionally precluded the jury from considering sympathy or sentiment. Specifically, he complains that by incorporating first-stage instructions into the second stage, which included one instructing the jury not to allow sympathy to enter into the deliberations, the court precluded the jury from considering all pertinent information. This, too, has been previously discussed and found to be without merit. *See LaFevers v. State,* 897 P.2d 292, 309 (Okl.Cr.1995) and cases cited therein.[23] Accordingly, we find no merit to Appellant's twelfth proposition of error.

### I.

■ Appellant next claims the instructions were erroneous, as they permitted the jury to conclude the death penalty must be returned if aggravating circumstances outweighed mitigating evidence. Appellant acknowledges we have held a life sentence may be given, even if the jury finds aggravating circumstances present which outweigh mitigating circumstances, but an instruction to this effect is not necessary. However, he claims we have been inconsistent in our characterization of this rule. *Compare Neill,* 896 P.2d at 557 *with McGregor v. State,* 885 P.2d 1366, 1384 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

We see no inconsistency. In *McGregor,* we reiterated the rule in Oklahoma that "[a] life sentence may be given notwithstanding a

22. We observe that, as this case must be remanded for a new sentencing hearing, the trial court will use the new OUJI–CR 2d instructions, which have made provisions for this and other complaints set forth by Appellant and addressed below.

23. It is appropriate at this point to point out that, at least on the surface, the State did not respond to this argument. Upon closer examination, this Court has found that the State did indeed respond, but that response was buried inside a section of the State's brief which grouped togeth-

er responses to several of Appellant's propositions of error into one proposition. There is no prohibition against such a practice in this Court's rules. *See* 22 O.S.Supp.1996, Ch. 18, App. *Rules of the Court of Criminal Appeals,* Rules 9.3 and 3.5. However, the State does itself no favor by such a practice. The clumping of issues, combined with a generalized discussion of each, risks an accusation it does not adequately—if at all—discuss and analyze propositions of error raised in an appellant's brief.

jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required." *Id.* at 1384 (citing *Parks v. State*, 651 P.2d 686, 694 (Okl.Cr.1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983)). And contrary to Appellant's assertions, we did not in *Neill* state the principle as "jury nullification." Rather, we quoted from *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1987), where we found no error in an appellant's claim the court erred refusing to give his requested instruction on "jury nullification," which he had defined as "the jury's exercise of its inherent 'power to bring in a verdict of [acquittal] in the teeth of both the law and facts.' " It is this context in which the words "jury nullification" appear.

We also note that, even without the instruction, defense counsel took great pains to repeatedly tell the jury during both voir dire and closing argument that, even if they found the presence of aggravating circumstances, and those aggravating circumstances outweighed mitigating circumstances, the jury did not have to return with a sentence of death.

For these reasons, we find Appellant's thirteenth proposition to be wholly without merit.

## IV. ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

In his fourteenth proposition of error, Appellant complains prosecutorial misconduct prejudiced his rights and improperly contributed to his conviction and punishment.

■ He first complains the prosecutor acted improperly in asking questions concerning the death penalty during voir dire which the court had asked earlier. Appellant also complains the prosecutor asked hypothetical questions to the panel about whether they could vote for the death penalty in a particular instance. Appellant also cites other instances, which he admits were not preserved by a proper objection. Again, when reading the voir dire comments in context, the prosecutor stressed to the panel a decision to impose death "should be difficult," adding "[a]nd that's the point I'm wanting to make here. This is serious. Discussions [sic] over. We're getting ready to do something pretty serious here. And I appreciate that point. That's exactly the point I'm trying to make." We find no error here. Reading the questioning as a whole, it is obvious the prosecutor was stressing to the jury that they were not engaged in a theoretical discussion about some abstract concept or person, but rather were talking about the particular person in front of them, and considering an issue that "is as serious as it gets." We find no error here. *Roberts v. State*, 868 P.2d 712, 718 (Okl.Cr.), *cert. denied*, 513 U.S. 855, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994).

■ Appellant next complains the prosecutor improperly attempted to define "reasonable doubt." The record shows the prosecutor, in response to a juror's answer that if she believed he was guilty "without a shadow of a doubt" she could act in an appropriate manner, interrupted the venireperson by observing the court would instruct the burden of proof was "beyond a reasonable doubt. Just beyond a reasonable doubt. Now obviously beyond a shadow of a doubt is different." At that point defense counsel objected, and the court admonished the panel that "[n]either party can define the term reasonable doubt, nor can the court, under the statutes and state law. No one is allowed to do so." We find no reversible error here. *Cheatham v. State*, 900 P.2d 414, 422 (Okl.Cr. 1995). This admonition was sufficient to cure any error which may have occurred. *Manuel v. State*, 803 P.2d 714, 717 (Okl.Cr.1990).

■ Appellant next complains that the prosecutor in his opening statement stated a substantial fact he did not prove during the course of the trial. He told the jury that when a neighbor found the victim immediately after the attack, the victim was "mumbling." He claims the prosecution did not produce such evidence in its case.

We first note the purpose of opening statement is to apprise the jury of the evidence the attorneys expect to present during trial, which is committed to the sound discretion of the trial court. *Hammon v. State*, 898 P.2d

1287, 1306 (Okl.Cr.1995). We also note that opening and closing statements are not evidence for the jury to consider. *Neill,* 827 P.2d at 887. There is a good reason for that. As a practical matter, we recognize that a prosecutor may in good faith tell the jury what he expects to prove, only to have that evidence evaporate during the case-in-chief. Absent evidence a misstatement was deliberate, we refuse to engage in speculation such an act rises to the level of prosecutorial misconduct. Additionally, Appellant has shown no prejudice. *See Shultz v. State,* 811 P.2d 1322, 1328 (Okl.Cr.1991); *Ellis v. State,* 651 P.2d 1057, 1062 (Okl.Cr.1982); *Kennedy v. State,* 640 P.2d 971, 980 (Okl.Cr.1982); *Woods v. State,* 440 P.2d 994, 996 (Okl.Cr.), *cert. denied,* 393 U.S. 953, 89 S.Ct. 378, 21 L.Ed.2d 364 (1968).

Here, Appellant has presented no such evidence. A prosecution witness first told the jury that the victim did not appear to be breathing, then said that when asked by the neighbor to give a signal she could hear, she breathed "real hard, just ahhh, and she did a few more breaths and I couldn't get anything else out of her." Based on this, we find no evidence the prosecutor deliberately misled the jurors in his opening statement. While not "mumbling," this does show some sort of vocal reaction. There is no merit to this claim.

■■■ We are next directed to the conduct of the prosecutor during cross-examination of the Appellant. At one point, Appellant apparently began crying on the witness stand, prompting the prosecutor to ask him if he was crying because he felt sorry for himself. The question did not initially draw an objection, thus waiving the complaint for all but plain, reversible error. A reading of Appellant's testimony and the prosecutor's cross-examination indicates he was trying, albeit unartfully, to point out the inherent unbelievability of Appellant's testimony. We have held when an appellant complains a prosecutor asked improper questions during cross-examination, "it must appear from the record that the questions were asked for the evident purpose of taking an unfair advantage of defendant, by containing therein matter which the examiner knew to be untrue, or

else incapable of proof." *Thompson v. State,* 541 P.2d 1328, 1336 (Okl.Cr.1975) (quoting *Valenti v. State,* 392 P.2d 59 (Okl.Cr.1964)). The record fails to meet these requirements.

■■■ Appellant also complains of comments made by the prosecutor during closing arguments. Many of these comments were not met with an objection, and are thus waived for all but plain, reversible error. *Robinson v. State,* 900 P.2d 389, 395–96 (Okl. Cr.1995); *Hammon,* 898 P.2d at 1306–07; *Nolte v. State,* 892 P.2d 638, 644–45 (Okl.Cr. 1994). We find none here. Concerning those comments which drew a proper objection, we have examined each comment and find no error warranting reversal. While we do not condone many of the prosecutor's comments, in light of the totality of the evidence presented at trial, including eyewitness testimony by others that Appellant ran from the house carrying a bloody knife, and Appellant's own testimony he was present, we do not find the statements to be so egregious as to require reversal. *See Tibbs v. State,* 819 P.2d 1372, 1380 (Okl.Cr.1991); *Shultz,* 811 P.2d at 1328; *Brewer v. State,* 718 P.2d 354 (Okl.Cr.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 169 (1986).

Appellant also complains of comments during the second stage of his trial. In light of our holding in the mandatory sentence review, below, we need not address those comments.

## V. CUMULATIVE ERROR

Appellant here contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. We have reviewed Appellant's complaints concerning the guilt stage of his trial, and find error only in some of the prosecutor's comments. Therefore, there can be no cumulative error. We have found error relating to victim impact evidence in the second stage. That is addressed in the mandatory sentence review, below.

## VI. MANDATORY SENTENCE REVIEW

■■■ In section II.B., above, we determined there was sufficient evidence to sup-

port the jury's finding the murder was especially heinous, atrocious or cruel. However, we also found error in the admission of opinion evidence contained in the victim impact statement as to the nature of the crime; found error in the way the victim impact statement was prepared; and found error in the prosecutor's failure to provide a reasonable notice of what the victim impact statement would contain. *See* section II.A. We also found the trial court erred in rejecting a proposed instruction specifying extreme mental or emotional disturbance as a mitigating circumstance in section II.F., above.

Appellant's evidence in mitigation which was given to the jury included that he was 39 years of age; his family loved him; he suffered severe trauma as a child due to constant physical, mental and emotional abuse inflicted by his mother, and this trauma had a life-long effect on him and contributed to the murder of the victim; he suffered from both physical and mental abuse from the victim; he posed no threat to society while he had been incarcerated in jail; he turned himself in voluntarily; he had shown remorse; and he had two small children who deserved an opportunity for a relationship with their father.

We are disturbed by the omission of the mitigating circumstance relating to Appellant's evidence regarding mental or emotional disturbance leading up to the homicide. However, we need not determine the effect of this omission alone, as this error is combined with the improper introduction of the victim impact evidence. In *Cargle,* we upheld four aggravating circumstances in each murder; the presence of such a strong case was a factor in our harmless error analysis there. *Id.,* 909 P.2d at 835. Here, there is only one aggravator, the jury having rejected a second; and the improperly admitted evidence went to the emotional impact of the death on the victim's family.

We do not intend to imply there is a numerical significance to the number of aggravating circumstances found as opposed to the amount of the victim impact or mitigating evidence available; rather, as we stated in *Cargle,* improper admission of victim impact evidence as it relates to emotional impact

presents a greater risk the introduction of that evidence will necessitate a remand. *Id.* at 830.

We find this case must be remanded for a new sentencing trial, as we cannot say the introduction of the evidence in this particular case was harmless beyond a reasonable doubt. *Bartell v. State,* 881 P.2d 92, 95 (Okl.Cr.1994).

## VII. CONCLUSION

Finding no error warranting reversal of the judgment, Appellant's conviction for murder in the first degree is **AFFIRMED**. Based on the errors discussed above, we hereby **VACATE** the sentence of death, and **REMAND** this case for a new sentencing hearing. *See Salazar,* 919 P.2d at 1125, 67 OBJ at 1991–92.

CHAPEL, P.J., and JOHNSON, J., concur.

STRUBHAR, V.P.J., and LANE, J., concur in result.

STRUBHAR, Vice Presiding Judge, concurring in result:

I concur in result and join with Judge Lane in his Opinion.

LANE, Judge, concurring in results:

The majority fails to distinguish properly between the form, content, and use of *victim impact evidence* authorized by Title 21 O.S. Supp.1992, § 701.10, and *victim impact statements* authorized by Title 22 O.S. Supp. 1992, §§ 984 and 984.1. Once it takes this wrong turn, it attempts to correct its own mistake by gutting the content of victim impact *statements.* This unnecessary surgery violates both legislative intent and principled statutory construction.

I have been troubled for some time by this Court's treatment of victim impact evidence and victim impact statements. See, *Charm v. State,* 924 P.2d 754 (Okl.Cr.1996)(J. Lane dissenting); *Cargle v. State,* 909 P.2d 806 (Okl.Cr.1996) (J. Lane concurring specially). I have stated publicly my belief that this type of information is ripe for abuse, and I am

concerned as well that we as a Court have approved a procedure for its use which is not authorized by statute. The majority opinion beautifully illustrates both of these problems.

In the sentencing stage of a capitol murder trial the legislature has authorized the State to present *victim impact evidence* to the jury about the victim and the impact of the murder on the family of the victim. 21 O.S. Supp.1992, § 701.10[C]. This evidence is sworn, is subject to all the statutory and constitutional rules of evidence and criminal trial procedure, and is limited in scope to information about the victim and the impact of the murder on the victim's family. The authorized scope does not include circumstances surrounding the crime and the manner in which the crime was committed. Because this evidence is subject to all the rules of evidence, the trial court must guard against the admission of material which, even though within the authorized scope, is substantially more prejudicial than probative.

The majority errs twice when it constructs a convoluted analysis to decide whether the statement read by the victim's brother and the opinions expressed by him should have been *admitted into evidence.* In the first place the statement was not sworn and it was therefore not evidence. There is no statutory authority for the presentation of such a statement to the jury in the second stage of a capitol murder trial. In the second place, the content went beyond the authorized scope and addressed the circumstances surrounding the crime and the way it was committed. No balancing is necessary here, for under no circumstance is it admissible to the jury in the second stage of a capital trial.

There is a place in the criminal trial process for unsworn statements by family members about the victim of violent crime, the circumstances surrounding the crime, the manner the crime was committed, and the speaker's opinion of the sentence which has been recommended. These statements, unfettered by the rules of evidence, may be presented to the sentencing judge at the sentencing proceeding. *See* 22 O.S. Supp. 1992, § 984.1(A). The majority misinterprets Section 984(1) to permit a victim to make a sentence recommendation to the jury, when the section clearly allows "... the victim's opinion of a recommended sentence". The sentence may have been recommended by the jury, the district attorney, the judge, or any other proper source. Applying the plain language of the statute, the family member does not recommend a sentence.

The majority compounds its mistakes when it attempts to harmonize the authorization of *victim impact statements* in Title 22 and *victim impact evidence* in Title 21. Instead of giving force and effect to both kinds of victim impact information, the majority distorts the definition of victim impact statements found in Title 22 and finds the opinion of the victim's brother that this killing was a selfish and brutal butchering is not a statement concerning the circumstances of the crime or the way it was committed. Of course it is. The constitutional problems arise in this case because we have failed to recognize these victim opinions were never intended to be admitted into evidence and placed before the jury. They are akin to the defendant's right of allocution and are to be presented only to the sentencing judge at the sentencing proceeding. *See Duckett v. State,* 919 P.2d 7, 19 (Okl.Cr.1995)(there is no statutory, common-law or constitutional right for a defendant to make a plea for mercy or otherwise address the sentencing jury); *Mitchell v. State,* 884 P.2d 1186, 1205 (Okl.Cr.1994)(defendant's right of allocution is satisfied when the defendant is given the opportunity to address the court at formal sentencing). The compelling simplicity of this solution is amply supported by the statutory language.